UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

CHEYENNE JOHNSON, on behalf of
X.M., a minor

                    Plaintiff,                       Case No. 1:22-cv-12638

v.                                              Honorable Thomas L. Ludington
                                              United States District Judge

MOUNT PLEASANT PUBLIC SCHOOLS, et al.,

                    Defendants.

_____/

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IN PART**

On November 10, 2021, Plaintiff X.M.—a sixth-grade special education student at Mount Pleasant Middle School (MPMS)—allegedly told another student that he brought a gun to school. Accordingly, MPMS Assistant Principal Matthew Walderzak and Plaintiff's primary special education teacher, Jason Russell, searched Plaintiff's locker and person in an MPMS hallway. Finding no firearm, Walderzak and Russell told Plaintiff to return to class. But, the very next day, Plaintiff yelled "you're lucky I don't have my gun with me today!" while leaving a class. So, Walderzak and Russell searched Plaintiff's locker and person again. This November 11, 2021 search mirrored the November 10, 2021 search with one exception: after Plaintiff's locker and person were searched, revealing no firearm, Plaintiff alleges Russell directed him into the special education classroom and asked him to pull his pants down. Russell adamantly denies this. Regardless of this dispute, Plaintiff was suspended for his comment about his gun, and returned to school on November 15, 2021.

On November 17, 2021, Plaintiff punched another student, and was required to serve another, in-school, suspension on November 19, 2021. The crux of this case concerns what

happened to Plaintiff on the morning of November 19, 2021. But what happened to Plaintiff that morning is starkly disputed.

According to Plaintiff, when he reported to Russell's special education classroom for homeroom, Russell ordered Plaintiff to go into the "Break Room," a small, white-brick room with no furniture, within Russell's larger special education classroom. Although the door to the Break Room does not lock, there is no interior doorknob. Plaintiff alleges that, once he was inside the Break Room, one of Russell's teaching assistants closed the door and placed a large metal doorstop on the outside of the door, which prevented Plaintiff from leaving for nearly twenty minutes.

According to Defendants, Plaintiff voluntarily walked into the Break Room that morning, as provided for in his Individualized Education Plan. Indeed, Russell maintains that he asked Plaintiff to come out of the Break Room and talk to him, but Plaintiff refused. Defendants aver the door to the Break Room was never closed, and that Plaintiff was free to leave the room at any time.

In November 2022, Plaintiff's mother, Cheyenne Johnson, sued Mount Pleasant Public Schools, Russell, Walderzak, and four other MPMS staff members who were involved in Plaintiff's special education. Plaintiff's twelve-count Complaint asserts numerous federal constitutional claims, federal statutory claims, state statutory claims, and common law torts. All Defendants presently seek summary judgment. For reasons explained below, Defendants' joint Motion for Summary Judgement will be granted in large part. However, due to the genuine factual disputes concerning aspects of the November 11, 2021 search and the November 19, 2021 Break Room placement, Plaintiff's Fourth Amendment claim against Mr. Russell will survive summary judgment. All other claims against all other Defendants will be dismissed.

# I.

## A. Plaintiff and His IEP

Plaintiff X.M. attended Mount Pleasant Public Schools (MPPS) in Mount Pleasant, Michigan from kindergarten through the sixth grade. This case concern's Plaintiff's experience as a sixth grader at Mount Pleasant Middle School (MPMS) in late 2021. But before outlining Plaintiff's experience as a sixth grader, it is worth pausing to understand both the academic challenges he faced, and the academic services MPPS provided him.

Like most boys his age, Plaintiff enjoys a wide range of hobbies, his favorites of which include playing sports, playing video games, and cooking. *See* ECF No. 41-5 at PageID.604–08. Plaintiff is both Black and a registered member of the Sault St. Marie Band of Chippewa Indians. *See* ECF Nos. 1 at PageID.4; 41-3 at PageID.474; 41-4 at PageID.556. Moreover, Plaintiff suffers from Attention Deficit Disorder (ADD), Obstruction Defiance Disorder (ODD), and severe depression. ECF No. 41-4 at PageID.538–39, 542. Because of these emotional and behavioral challenges, Plaintiff was placed on an Individualized Education Plan (IEP) in late 2018, when he was in the third grade at MPMS. *See* ECF No. 39-3 at PageID.316.

An IEP is a "written document for [a] student with disabilities" which identifies the student's academic needs, sets academic goals, and "document[s] the services the school district will provide to help the student achieve these goals." *Family Matters: Individualized Education Program (IEP) Fact Sheet*, MICH. DEP'T OF EDUC. OFF. OF SPECIAL EDUC. (Nov. 2021), https://www.michigan.gov/mde/-/media/Project/Websites/mde/specialeducation/familymatters/ FM1/IEP_FactSheet.pdf?rev=c5e5ee0ed0e44203919866f7b17f0a24 [https://perma.cc/6T5V-28 FC]. Each student has an IEP Team, uniquely assembled to ensure the IEP is properly implemented. *Id.* IEP Team members include at least one of the student's general education

teachers, at least one of the student's special education teachers, a school district representative, and the student's parents. *Id.* Importantly, IEPs must be reviewed annually and are "legal, enforceable documents" because "the school district is required to provide" any services and programs listed on a student's IEP. *Id.*

Plaintiff's IEP Evaluation noted that, although Plaintiff was a "capable student," he was frequently disciplined—and sometimes suspended—for his aggressive and inappropriate behavior throughout kindergarten and first grade. ECF No. 39-3 at PageID.320. Plaintiff's teachers reported Plaintiff was quick to anger and outbursts, which often escalated to Plaintiff "rolling on the floor and screaming." *Id.* One teacher reported Plaintiff frequently "hit himself" and "pull[ed] his ears." *Id.* at PageID.318. Ultimately, the Evaluation noted that Plaintiff was hyperactive and aggressive, and concluded that Plaintiff's "ADHD" and behavioral concerns qualified as an "other health impairment" such that Plaintiff should be subject to an IEP. *Id.* at PageID.317, 320–21.

Academically, Plaintiff's first IEP, issued in 2018, reflected that Plaintiff excelled in math but struggled with reading and writing, and would engage in problematic behavior when presented with subjects or assignments he did not enjoy. *See* ECF No. 39-5 at PageID.329. To address these issues, the 2018 IEP provided Plaintiff with breaks in the day to alleviate stress, alternative testing locations, and extended time on assessments. *Id.* at PageID.335. Importantly, although Plaintiff was subject to an IEP and received special educational services, he still received general education at MPMS, which included taking classes and participating in electives with students not subject to IEPs. *See id.* at PageID.339; *see also* ECF No. 41-3 at PageID.510. Plaintiff's IEP was reassessed and amended numerous times from December 2018—when Plaintiff was in the third grade— through late 2021—when Plaintiff was in the sixth grade. *See, e.g.*, ECF Nos. 39-7 (April 2019 Amendment); 39-9 (October 2019 Amendment); 39-11 (January 2020 Annual Review); 40-5

(October 2020 Amendment); 40-7 (December 2020 Annual Review); 40-9 (May 2021 Review) And Plaintiff's IEP team issued numerous progress reports. ECF Nos. 39-8 (June 2019); 39-10 (November 2019); 40-3 (May 2020); 40-6 (November 2020); 40-10 (June 2021).

Plaintiff's May 2021 IEP, in effect when Plaintiff was a sixth-grader at MPMS, noted that Plaintiff was positive, polite, and personable in a one-on-one setting. ECF No. 40-9 at PageID.427. But Plaintiff's teachers noted that Plaintiff "completed very little work" during the fifth grade and missed 27% of the school year. *Id.* at PageID.428. Plaintiff's May 2021 IEP also noted that Plaintiff, during his fifth-grade year, frequently swore in class, destroyed property, refused to comply with teachers, left class without permission 13 times, and "was physical with his peers" six times. *See id.* at PageID.428–31. To address these behavioral and academic concerns, Plaintiff's May 2021 IEP provided Plaintiff with the following aids and services:

(1) Breaks, as directed by either Plaintiff himself or his teachers;
(2) Alternative testing locations in non-stressful environments with appropriate supervision;
(3) Extended time on tests and assignments;
(4) A 25% reduction in workload;
(5) Speech-to-text tools to assist in writing assignments longer than one paragraph;
(6) Social work services, specifically 1-4 therapy sessions per month; and
(7) Transportation to school via a "private carrier."

*Id.* at PageID.432–36. Plaintiff's sixth-grade IEP team included:

(1) Plaintiff himself;
(2) Cheyenne Johnson, Plaintiff's mother;
(3) Jason Russell, Plaintiff's primary special education teacher at MPMS;
(4) Ron Aherns, one of Plaintiff's general education teachers at MPMS;
(5) Erin Ulrich, an MPPS psychologist and one of Plaintiff's "Special Education Providers;"
(6) Abby Duynslager, an MPPS social worker and one of Plaintiff's "Special Education Providers;"
(7) Darby Weaver, MPPS' Principal and District Representative; and
(8) Stefanie House, MPPS' Special Education Supervisor and District.

*See* ECF No. 41-2 at PageID.449.

Until November 2021, Mr. Russell, Plaintiff's primary special education teacher, recalls having an "exceptionally good" relationship with Plaintiff and Plaintiff's mother, Cheyenne Johnson. ECF No. 41-3 at PageID.475–76. Indeed, according to Mr. Russell, Johnson was incredibly supportive of the way Mr. Russell worked with Plaintiff, and Mr. Russell believed that, under his instruction, Plaintiff was "making progress" and getting his behavior "under control." *Id.* But these relationships deteriorated after the events of November 2021. *Id.* at PageID.475.

### B. November 10, 2021 Search

On November 10, 2021, while Plaintiff was in the sixth grade, another student, D.H., reported to MPPS Assistant Principal Matthew Walderzak that Plaintiff told D.H. that he brought a gun to school. ECF No. 42-1 at PageID.696–97. In response, Assistant Principal Walderzak went to Mr. Russell's special education classroom to see if Plaintiff was there. *See* ECF No. 41-3 at PageID.477. Mr. Russell told Assistant Principal Walderzak that Plaintiff was in Mr. Ahern's general education classroom. *See id.* Russell and Walderzak then searched Plaintiff's locker, which was located just outside Mr. Russell's classroom, but found nothing, "not even a backpack." ECF No. 41-3 at PageID.477–78. So, Assistant Principal Walderzak and Mr. Russell went to Mr. Ahern's classroom and asked Plaintiff to step into the hallway. *See id.* at PageID.477–78; *see also* ECF No. 42-1 at PageID.697. Once in the hallway, Assistant Principal Walderzak and Mr. Russell asked Plaintiff if he brought a gun to school. See ECF No. 41-10 at PageID.660. Plaintiff said "no." ECF No. 42-1 at PageID.697. As reflected by MPMS security camera footage, Walderzak and Russell then asked Plaintiff to pat *himself* down and show the inside of his pockets. *See* ECF Nos. 42-2 at 0:09–0:21; 42-1 at PageID.698; 41-11 at PageID.662; 41-10 at PageID.660. Although Assistant Principal Walderzak recalls asking Plaintiff to lift his shirt to ensure nothing was tucked in his waistline, ECF No. 42-1 at PageID.698, the security footage of the search does not show

Plaintiff lifting his shirt or removing any article of clothing. ECF No. 42-2 at 0:09–0:21. The security footage further reflects, and Plaintiff concedes, that Assistant Principal Walderzak and Mr. Russell did not physically touch Plaintiff during the 13-second search. *See* ECF Nos. 42-2 at 0:09–0:21; ECF No. 41-5 at PageID.618. After Plaintiff showed the inside of his pockets were empty, Walderzak and Russell told Plaintiff to return to class. ECF Nos. 41-3 at PageID.478; 41-5 at PageID.618. Mr. Russell then texted Plaintiff's mom—Cheyenne Johnson—about the report and search. ECF No. 42-8 at PageID.720. Mr. Russell suggested that Johnson "maybe chat w[ith] [Plaintiff] about saying those things at school" and Johnson responded, "definitely will thank you," noting that Plaintiff "doesn't even have access to a fire arm." *Id.*

### C. November 11, 2021 Search and Suspension

But this wasn't the only time Plaintiff was searched for a firearm. The very next day, on November 11, 2021, Plaintiff's math teacher, Mr. Weber, overhead Plaintiff laughing with another student about the other student's drawing of a shooting. ECF Nos. 41-10 at PageID.660; 41-3 at PageID.479. Referring to the drawing, Mr. Weber told Plaintiff and the other student "I hope you're going to put [']Nerf['] on that gun." ECF No. 41-10 at PageID.660. Plaintiff replied "yeah, it's a nerf gun" but, after that class ended, Plaintiff "walked across the hall and yelled "[y]ou're lucky I don't have my gun on me today!" *Id.* Mr. Weber reported this incident to Mr. Russell, who in turn reported the incident to Assistant Principal Walderzak. *Id.*; ECF Nos. 41-11 at PageID.662; 41-3 at PageID.481. Like the day before, Assistant Principal Walderzak and Mr. Russell searched Plaintiff's locker and then searched his person, asking him to show the inside of his pockets. ECF Nos. 42-1 at PageID.702; 41-3 at PageID.481. Nothing was found. As reflected by MPMS security camera footage, at no time during the one-minute November 11, 2021 search did Walderzak or Russell touch Plaintiff. *See* ECF Nos. 42-6 at 1:12–1:51; 42-1 at PageID.704.

What happened next is disputed. Plaintiff alleges that Mr. Russell "strip searched" him on November 11, 2021, after the two were inside Mr. Russell's special education classroom—which does not have security cameras. ECF No. 41-5 at PageID.618–19. Specifically, Plaintiff alleges that Mr. Russell asked him to lift his shirt and "[p]ull [his] pants down." *Id.* Mr. Russell expressly denies this. ECF No. 41-3 at PageID.478. Instead, Mr. Russell claims that, after the search of Plaintiff's person and locker, he sent Plaintiff to the "Break Room"—a designated room within Mr. Russell's special education classroom, discussed in greater detail below—for a five-minute "break." *Id.* at PageID.481–82, 486. Mr. Russell further claims that, just before Plaintiff went into the Break Room, he asked Plaintiff to show and empty his pockets, again, to ensure Plaintiff had nothing that could damage the room or harm himself. *Id.* at PageID.482. After Plaintiff's five-minute break, Plaintiff returned to his general education class. ECF No. 39 at PageID.272.

Plaintiff was suspended for one-and-a-half days for using "[i]nappropriate [l]anguage," including his multiple references to "gun[s]" during class. ECF No. 42-4. Plaintiff was allowed to return to school on Monday, November 15, 2021. *Id.*

### D. November 17, 2021 Suspension

On November 17, 2021, towards the end of the school day, an MPMS computer teacher saw Plaintiff punch another student in the groin with enough force that the other student "fell onto the floor."[1] ECF No. 42-7 at PageID.720; *see also* ECF Nos. 41-3 at PageID.488; 41-5 at PageID.623–24. The teacher reported this incident to Mr. Russell, who in turn reported the incident

---

[1] Notably, Plaintiff avers the student he punched was one of three students who had beat Plaintiff up earlier in the day, while Plaintiff was using the bathroom. *See* ECF No. 41-5 at PageID.623. But Assistant Principal Walderzak testified that he does not remember receiving any complaints that Plaintiff was bullied. ECF No. 42-1 at PageID.677. And Mr. Russell testified that he was never informed that Plaintiff was bullied—either from Plaintiff himself or other teachers. ECF No. 41-3 at PageID.511–12.

to Assistant Principal Walderzak and the MPMS administration, who in turn suspended Plaintiff, again. ECF No. 41-3 at PageID.488. Mr. Russell texted Plaintiff's mother—Cheyenne Johnson—about the incident and the suspension. ECF No. 42-8 at PageID.720. Johnson informed Mr. Russell that Plaintiff would not be in school the next day, November 18, 2021, because he "ha[d] a med review." *Id.* Mr. Russell replied with his suggestion that Plaintiff serve an in-school suspension on November 19, 2021, and Johnson agreed. *See id.*

### E. November 19, 2021 and the Break Room

The central question in this case is what happened when Plaintiff returned to MPMS on November 19, 2021. All Parties agree that, at some point in the morning, Plaintiff was in the "Break Room." The Break Room is a small room within Mr. Russell's larger special education classroom. Its purpose is twofold. Special education students can voluntarily go to the breakroom, as specified in their IEPs, whenever they feel frustrated, anxious, or need space away from the rest of the class. ECF 41-3 at PageID.482 (referring to the Break Room as the "break room"). But teachers, including Mr. Russell, can also direct special education students to the Break Room if the student is "out of control physically," or if they pose "a danger to themselves or others." *Id.* at PageID.508 (referring to the Break Room as the "time away room"). Notably, Mr. Russell explained that the Break Room has been used for this latter purpose less than five times during the last ten years. ECF 41-3 at PageID.513. Mr. Russell further explained that, although the Break Room could be used "as a means of time out," it was never used for disciplinary purposes.[2] *Id.* at

---

[2] Notably, Assistant Principal Walderzak initially testified during his deposition that the Break Room was "[f]or disciplin[ary] purposes such [that] if a student were to be suspended in [Mr. Russell's special education] program, that spending time in that [Break] [R]oom was an option." ECF No. 42-1 at PageID.693. But Walderzak then clarified that he would have no reason to dispute Mr. Russell's claims to the contrary. *Id.* at PageID.706.

PageID.506 (explaining "time out" is for emotional recovery while "discipline would be more punitive, like a suspension").

Regardless of whether a student went into the Break Room on their own accord or was sent there by a teacher, a student typically stayed in the Break Room for no longer than five minutes. *Id.* at PageID.483. To ensure students in the Break Room do not harm themselves, *id.* at PageID.482, the Break Room is completely baren:



ECF No. 54 at PageID.1139.

The only window in the Break Room is on the door separating it from the rest of Mr. Russell's special education classroom, and that window is partially covered with a piece of paper.[3]

---

[3] Mr. Russell explains that the window on the Break Room door is partially covered to protect student privacy by ensuring other students cannot see inside. ECF No. 41-3 at PageID.483–84. But Mr. Russell concedes that this paper similarly prevents a student inside the Break Room from seeing outside. *Id.* at PageID.484.

ECF No. 39 at PageID.273. The Break Room lacks any furniture, unless a student who voluntarily goes to the Break Room requests a chair or desk. ECF No. 41-3 at PageID.483. Importantly, the door to the breakroom *does not lock*, *id.* at PageID.484, but also *does not have an internal doorknob or handle.* ECF No. 59-2 at PageID.2136. Accordingly, Mr. Russell explained that, when a teacher sends a student to the Break Room—rather than the student going there on their own accord—the teacher may hold the handle on the outside of the door shut "so that the door couldn't be opened" ECF No. 41-3 at PageID.509.

Although all Parties agree that Plaintiff was in the Break Room at some point during the November 19, 2021 school day, they dispute why Plaintiff was there, how long he was there, and whether he was able to leave.

Plaintiff alleges that he reported to Mr. Russell's classroom—his homeroom—as soon as he got to school on November 19, 2021. *See* ECF No. 41-5 at PageID.624. According to Plaintiff, Mr. Russell immediately directed Plaintiff to the Break Room. *See id.* at PageID.625. Plaintiff picked up his breakfast, which was provided to special education students by MPMS, and proceeded to the Break Room. *Id.*; *see also* ECF No. 41-3 at PageID.500. Plaintiff avers he was trapped in the Break Room for twenty minutes. ECF No. 41-5 at PageID.624. Crucially, Plaintiff avers that the door to the Break Room was fully closed and, despite his efforts to push the door open from the inside, he could not. *Id.* at PageID.625–27. Specifically, Plaintiff believes that one of Mr. Russell's professional assistants closed the door behind Plaintiff once he was in the Break Room and that someone used a "metal door stop" to keep the door shut. *Id.* at PageID.627–29. Indeed, Plaintiff alleges he has seen MPMS staff use the metal door stop to shut special education students in the Break Room, before. *See id.* at PageID.627.

Mr. Russell and Assistant Principal Walderzak have a different perspective. According to Mr. Russell, when Plaintiff arrived at homeroom on the morning of November 19, 2021, he immediately and voluntarily walked into the Break Room. ECF No. 41-3 at PageID.490, 496. Mr. Russell avers he asked Plaintiff to come out of the Break Room because he wanted to talk with Plaintiff about why Plaintiff punched another student two days prior. *Id.* at PageID.490–91 ("And I just said, hey, talk to me, buddy. What's going on? What happened?"). But, according to Mr. Russell, Plaintiff "walked away" and "walked back in" the Break Room. *Id.* at PageID.491. Mr. Russell avers he then suggested Plaintiff get breakfast, "regroup," and, when Plaintiff was ready, the two could discuss what Plaintiff would do throughout the day as part of his in-school suspension. *Id.* at PageID.490–91. Mr. Russell maintains the Plaintiff closed the door behind him when he went back to the Break Room, and that the door was only "partially closed." *Id.* at PageID.500. Mr. Russell also expressly denies blocking the door, and maintains Plaintiff was free to leave the Break Room at any time. *Id.* at PageID.485, 501, 505. Assistant Principal Walderzak corroborates this claim, and notes, to his knowledge, that no MPMS staff member has ever prevented a student in the Break Room from leaving, either by holding the door shut or by using a stopper or other object. ECF No. 42-1 at PageID.682, 691–92.

It is undisputed that, while Plaintiff was in the Break Room, he recorded a video using his cellphone, and sent the video to his mother, Cheyenne Johnson. *See* ECF Nos. 42-9; 42-10. The video shows Plaintiff sitting on the floor of the empty Break Room, next to his breakfast. ECF No. 42-10. Although the majority of the eleven-second video only shows the walls of the Break Room, Plaintiff pans to the door during the last second and the door appears to be closed. *Id.* at 0:10–0:11. Johnson responded to Plaintiff's video by texting "wtf" and Plaintiff replied, "U better get ready

for a call I'm bout to run out da school to de marathon[.]" ECF No. 42-9 at PageID.721. Johnson

responded "I'm on my way to get you[.]" *Id.* At 8:16 AM, Johnson texted Mr. Russell:

> So the schools idea of an in school suspension is to stick a child in a room with no
> school work and no desk? I'm curious as to why my child with psychological
> problems is sitting in a room in conditions similar to a holding tank at the county
> jail. This is completely unacceptable and I will be there to get my child and his
> belongings he will no longer attend [MPMS].

ECF No. 42-8 at PageID.720. Mr. Russell replied, "Ok. I will have him and his things in the office

for u." *Id.* Mr. Russell then escorted Plaintiff to MPPS Principal Darby Weaver's office, and

returned to his class. *See* ECF No. 41-3 at PageID.504; 41-4 at PageID.569. Johnson arrived at

MPMS shortly thereafter and picked Plaintiff up. ECF No. 41-4 at PageID.570. 572.

### F. Plaintiff's Withdraw from School

Plaintiff did not return to MPMS until March 2022. ECF No. 41-4 at PageID.576–77. In

December 2021, Johnson emailed Plaintiff's IEP team a note from Plaintiff's pediatrician which

stated that, for Plaintiff's "health [and] safety," Plaintiff should be homeschooled. ECF No. 43-1.

Notably, however, the pediatrician's visit report reflects that Plaintiff was seen on December 2,

2021 for complaints of coughing, sore throat, and vomiting. ECF No. 43-2 at PageID.734–35. The

report notes Plaintiff was diagnosed with strep throat, but says nothing about Plaintiff's schooling

or related stressors and anxiety. *Id.*

Plaintiff's IEP team met on January 5, 2022 to consider amending Plaintiff's IEP and to

consider whether Plaintiff should be homeschooled. *See* ECF No. 43-4 at PageID.742. Plaintiff's

IEP team expressly concluded Plaintiff was not eligible for "homebound services" because neither

the pediatrician note nor Johnson provided sufficient certification information. *Id.* at PageID.744.

Nevertheless, Johnson voluntarily withdrew Plaintiff from MPMS that same day, and

homeschooled him until March 2022. ECF Nos. 43-5 at PageID.746; 41-4 at PageID.576. In March

2022, Plaintiff returned to in-person learning at MPMS, but switched to virtual learning soon after. ECF No. 41-4 at PageID.571–72, 575. After Plaintiff's sixth-grade year, he transferred from MPPS to the Bridgeport-Spaulding Public School system.[4] ECF Nos. No. 41-5 at PageID.615; 41-5 at PageID.527, 535.

## G. Procedural Posture

In November 2022, Johnson sued (1) MPPS; (2) Mr. Russell—Plaintiff's primary special education teacher; (3) Assistant Principal Walderzak; (4) Erin Ulrich—one of Plaintiff's special education providers and a school psychologist; (5) Principal Darby Weaver; (6) Ron Aherns—one of Plaintiff's general education teachers; and (7) Stephanie House—MPPS's Special Education Supervisor. ECF No. 1. Plaintiff's twelve-count Complaint alleges the following:

| Count | Claim | Defendants |
|---|---|---|
| I. | Fourteenth Amendment Racial Discrimination; 42 U.S.C. § 1983 | All Defendants |
| II. | Fourth and Fourteenth Amendment "Due Process" Violation; 42 U.S.C. § 1983 | All Defendants |
| III. | *Monell* Municipality Liability; 42 U.S.C. § 1983 | MPPS |
| IV. | Racial Discrimination; Michigan Elliott-Larsen Civil Rights Act | All Defendants |
| V. | Ethnic Intimidation; MICH. COMP. LAWS § 750.147b | All Defendants |
| VI. | Intentional Infliction of Emotional Distress | All Defendants |
| VII. | Assault and Battery | All Defendants |
| VIII. | Failure to Educate; 34 C.F.R. § 300.17 | All Defendants |
| IX. | Discrimination; Section 504 of the Rehabilitation Act | All Defendants |
| X. | Failure to Educate; Michigan Mandatory Special Education Act | All Defendants |
| XI. | Failure to Educate Individuals with Disabilities Education Act | All Defendants |
| XII. | School Seclusion and Restraint Violations; Michigan Public Act 394 of 2016 | All Defendants |

---

[4] Since transferring to Bridgeport, Plaintiff has been suspended for fighting and missed several days of school. *See* ECF No. 41-4 at PageID.536–37.

*See generally id.* All Defendants seek summary judgment on all claims. ECF No. 39.

## II.

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party, who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."[5] *Id.* at 251–52.

When the moving party "also bears the burden of persuasion at trial, [its] 'initial summary judgment burden is "higher in that it must show that the record contains evidence satisfying the

---

[5] This Court cannot assess the competency and credibility of witnesses—such as the nonmovant Plaintiff—at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (noting "credibility determinations" are inappropriate at the summary judgment stage and that, instead, "[t]he evidence of the non-movant is to be believed"). However, Plaintiff is a minor who has a lengthy, documented history of both mental health struggles and misconduct, including dishonesty. *See* ECF Nos. 40-1 at PageID.387; 41-4 at PageID.552; 41-5 at PageID.620 (noting Plaintiff was "breaking down" during his deposition). In a case which largely hinges on Plaintiff's own testimony, such testimony may present genuine, and potentially dispositive, competency concerns for this Court to assess pretrial. Should the case proceed to trial, such testimony may also present genuine questions of Plaintiff's credibility. *See* FED. RS. EVID. 603; 608.

burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it.'" *Surles v. Andison*, 678 F.3d 452, 455–56 (6th Cir. 2012) (quoting *Cockrel v. Shelby Cty. Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001)); *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) ("[W]here the moving party has the burden—the plaintiff on a claim for relief or the defendant on an affirmative defense—his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.") (quoting W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487–88 (1984) (emphasis omitted))).

Plaintiff's twelve claims are best categorized as follows: federal constitutional claims; federal statutory claims; state statutory claims; and tort claims. Each category will be addressed in turn.

### III. Plaintiff's Constitutional Claims

Plaintiff alleges all Defendants deprived him of multiple Fourth and Fourteenth Amendment rights, in violation of 42 U.S.C. § 1983. *See* ECF No. 1 at PageID.8–14.

Under 42 U.S.C. § 1983, a plaintiff may sue any "person" who, under the color of state law, subjects any citizen to the deprivation of any rights, privileges, or immunities secured by the Constitution. *See* 42 U.S.C. § 1983. To prevail under § 1983, a plaintiff must prove (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law. *Winkler v. Madison Cnty.*, 893 F.3d 877, 890 (6th Cir. 2018); *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 736 (6th Cir. 2015); *see also Jones v. Muskegon Cnty.* 625 F.3d 935, 941 (6th Cir. 2015). It is undisputed that all Defendants acted "under the color of state law," here. Plaintiff asserts Defendants deprived him of his Fourteenth Amendment right to be free from racial discrimination; his Fourth Amendment right to be free from unreasonable

searches and seizures; and his Fourteenth Amendment substantive due process rights.[6] But Plaintiff

pursues his federal constitutional claims against both *individual* and *municipal* Defendants, and

different legal frameworks apply to each.

When an *individual* government-defendant is sued in their personal capacity, the doctrine

of qualified immunity shields them from liability if "their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have known.'"

*Getz v. Swoap*, 833 F.3d 646, 652 (6th Cir. 2016) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800,

818 (1982)). Indeed, qualified immunity protects "all but the plainly incompetent and those who

knowingly violate the law." *Id.*; *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018); *Ashcroft v. al-*

*Kidd*, 563 U.S. 731, 743 (2011).

When analyzing qualified immunity, courts apply the "*Saucier* two step," asking (1)

whether a constitutional right has been violated; and (2) whether that right was clearly

established—though reviewing courts need not proceed in this order. *See Pearson v. Callahan*,

555 U.S. 223, 236 (2009) ("[W]hile the sequence set forth [in *Saucier*] is often appropriate, it

---

[6] Plaintiff's constitutional claims are unclear. For example, Plaintiff alleges he was deprived of his "federal *substantive* due process rights" under both the "Fourth and Fourteenth Amendments." ECF No. 1 at PageID.10 (emphasis added). But the Fourth Amendment does not guarantee due process—it instead provides a right to be free from unreasonable searches and seizures. *See* U.S. CONST. amend. IV. And it is unclear whether Plaintiff also intended to allege a *procedural* due process violation in Count II. *See* ECF No. 1 at PageID.10; *see also* ECF No. 39 at PageID.286. Construing Plaintiff's Complaint liberally, Defendants argued both *procedural* and *substantive* due process claims do not survive summary judgment. ECF No. 39 at PageID.284–87. Plaintiff's response contests only the *substantive* due process claim. *See* ECF No. 54 at PageID.1162–64. Accordingly, to the extent Plaintiff intended to assert a *procedural* due process claim, Plaintiff has since abandoned it. *Anglers of the Au Sable v. U.S. Forest Serv.*, 565 F. Supp. 2d 812, 839 (E.D. Mich. 2008) ("It is well settled that abandonment may occur where a party asserts a claim in a complaint, but then fails to address the issue in response to an omnibus motion for summary judgment.")

should no longer be treated as mandatory."). The latter "clearly established" prong analyzes whether it was sufficiently clear that a reasonable officer would understand their actions violate a right. *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (citing *Reichle v. Howards*, 566 U.S. 658 (2012)). While there need not be a case directly on point, existing precedent must place the constitutional question "beyond debate." *Id.* Sources of "clearly established law" include, from most to least persuasive, Supreme Court precedent, controlling Sixth Circuit precedent, this Court's precedent, or a "robust consensus of cases of persuasive authority." *See Sutton v. Metro. Gov't of Nashville & Davidson Cnty.*, 700 F.3d 865, 876 (6th Cir. 2012); *Ashcroft*, 563 U.S. at 742. Importantly, when a defendant raises a qualified immunity defense, the plaintiff has the burden of demonstrating that defendant is not entitled to qualified immunity. *See Hart v. Hillsdale Cnty.*, 973 F.3d 627, 635 (6th Cir. 2020); *Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 403 (6th Cir. 2007).

On the other hand, when a *municipality* is sued—either directly or through a claim asserted against an individual in their official capacity—qualified immunity does not apply, but the evidentiary requirements of *Monell v. Dep't of Soc. Servs. Of City of New York* do. *Kentucky v. Graham*, 473 U.S. 159, 166, (1985). In *Monell*, the Supreme Court held that municipalities—like MPPS—can be treated as "persons" and subject to § 1983 liability. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978). But a municipality cannot be liable for § 1983 deprivations merely because they employ an officer who deprives someone of their constitutional rights.[7] *Monell*, 436 U.S. at 691 ("[A] municipality cannot be held liable under § 1983 on a respondent superior theory."). And a municipality cannot be liable if their officers commit no

---

[7] Redundantly, Plaintiff pursues his federal constitutional claims against all individual Defendants in their official capacities *and* against their undisputed employer, MPPS. ECF No. 1 at PageID.1; *see also Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (noting "an official-capacity suit is, in all respects other than name, to be treated as a suit against" the municipality that employs the individual defendant).

constitutional violation in the first place. *Roell v. Hamilton Cnty.*, 870 F.3d 471, 487 (6th Cir. 2017). Instead, municipalities are only liable under *Monell* for their "official policies" which cause an employee to violate another's constitutional rights. *Monell*, 436 U.S. at 692.

Generally, there are four "avenues a plaintiff may take to prove the existence of a [defendant's] illegal policy or custom. The plaintiff can look to (1) the [defendant's] legislative enactments or official agency policies; (2) single actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). But, even when a plaintiff can show a sufficient official policy, a plaintiff must also "connect the policy to the municipality, and [] show that [the] particular injury was incurred due to the execution of that policy." *Vereecke v. Huron Valley School Dist.*, 609 F.3d 392, 404 (6th Cir. 2010).

Each of Plaintiff's federal constitutional claims will be analyzed in turn, beginning with whether Plaintiff has shown an underlying constitutional violation. If so, the Court will then turn to whether the individual Defendants are entitled to qualified immunity, and whether Defendant MPPS is liable as a municipality under *Monell*.

### A. Fourteenth Amendment Racial Discrimination

In Count I, Plaintiff broadly alleges Defendants deprived him of rights secured by the Fourteenth Amendment Equal Protection Clause. ECF No. 1 at PageID.9. "The Equal Protection Clause of the Fourteenth Amendment provides that a state may not 'deny to any person within its jurisdiction the equal protection of the laws.'" *Maye v. Klee*, 915 F.3d 1076, 1085 (6th Cir. 2019) (quoting U.S. Const. amend. XIV. § 1). At its core, the Equal Protection Clause ensures that all persons similarly situated are treated alike. *May v. Klee*, 915 F.3d 1076, 1085 (6th Cir. 2019).

Although Equal Protection challenges are often asserted against legislation, they can also be asserted against specific instances of governmental discrimination.

### 1. Underlying Constitutional Deprivation

Plaintiff's Equal Protection claim is largely unclear. Plaintiff's Complaint broadly alleges Defendants "discriminat[ed], harass[ed], and retalitat[ed against Plaintiff] as a result of his race/ethnicity," but Plaintiff does not identify what specific conduct—of which specific Defendants—Plaintiff alleges to be discriminatory, harassing, or retaliatory. ECF No. 1 at PageID.9. In his Response to Defendants' Motion for Summary Judgment, Plaintiff seems to assert three distinct Equal Protection arguments: (1) Mr. Russell's decision to send Plaintiff to the Break Room on November 19, 2021 was motivated by racial discrimination, ECF No. 54 at PageID.1165; (2) Defendants provided services to special education students disparately based on race; *id.* at PageID.1144; and (3) Defendants were deliberately indifferent to Plaintiff's complaints that he was being bulled on account of his race, *id.* at PageID.1144–45. Each argument will be discussed in turn.

### a. Break Room "Motivation"

Plaintiff's first equal protection argument fails because nothing in the record even plausibly suggests that Mr. Russell sent Plaintiff to the Break Room because of Plaintiff's race. The Equal Protection Clause "prohibits only *intentional* discrimination." *Ryan v. City of Detroit*, 174 F. Supp. 3d 964, 971 (E.D. Mich. 2016), *aff'd* 698 F. App'x 272 (6th Cir. 2017) (emphasis added) (noting that a plaintiff bears the "heavy burden" in proving intentional or purposeful discrimination); *see also Klee*, 915 F.3d at 1085 ("Of course, to establish an equal protection violation, a plaintiff must establish more than differential treatment alone—a discriminatory intent or purpose is required."). Indeed, "'[p]roof of racially discriminatory intent or purpose is required' to show a violation of

the Equal Protection Clause." *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 189, 195 (2003) (quoting *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265 (1977)). And although this proof may take the form of circumstantial evidence, *Arlington Heights*, 429 U.S. at 266, not even circumstantial evidence of intentional racial discrimination exists, here.

Plaintiff argues there is, at least, a "genuine issue of material fact[] concerning the Defendants, and particularly Mr. Russell's [discriminatory] motivations for" sending Plaintiff to the Break Room on November 19, 2021. ECF No. 54 at PageID.1165. Not so. True, the Parties starkly dispute whether Mr. Russell, in fact, sent Plaintiff to the Break Room or whether Plaintiff walked in and out of the Break Room voluntarily. *See supra* Section I.B.4. But even assuming this dispute was resolved in Plaintiff's favor and that Mr. Russell sent Plaintiff to the Break Room, Plaintiff has not provided any evidence that Mr. Russell did so *because of Plaintiff's race*. Assuming Mr. Russell sent Plaintiff to the Break Room, the record at this juncture only plausibly supports two "motivations:" (1) Mr. Russell felt that Plaintiff was angry or frustrated and sent him to the Break Room to calm down; *see* ECF No. 41-3 at PageID.482–83, 490; or (2) Mr. Russell sent Plaintiff to the Break Room to discipline him, as part of Plaintiff's in-school suspension, *see* ECF No. 42-1 at PageID.693, 706–07. Because Plaintiff has not shown any evidence of intentional racial discrimination, his first Equal Protection argument will not survive summary judgment.

### b. Disparate Provision of Special Education Services

Plaintiff's second Equal Protection argument—alleging Defendants' disparate provision of special education services—fails for different reasons. To succeed on an Equal Protection disparate treatment claim, a plaintiff must show (1) the government defendants treated plaintiff disparately as compared to similarly situated persons; and (2) this disparate treatment burdens a fundamental

right, targets a suspect class, or has no rational basis. *Andrews, Tr. of Gloria M. Andrews Tr. Dated Apr. 23, 1998 v. City of Mentor*, 11 F.4th 462, 473 (6th Cir. 2021). Plaintiff sweepingly argues that Defendants provided preferential treatment to white special education students, serving them before or more often than Plaintiff. *See* ECF No. 54 at PageID.1143–44. In support of this argument, Plaintiff cites his own deposition testimony:

> **Plaintiff Counsel:** I believe you previously testified that some teachers treat you different. Do you remember saying that?
> **Plaintiff:** Yes.
> **Plaintiff Counsel:** Are you able to describe how you've been treated differently?
> **Plaintiff:** My needs are, like, always put last.
> **Plaintiff Counsel:** And who are you comparing yourself to?
> **Plaintiff**: The White kids.
> **Plaintiff Counsel:** Why do you feel that way?
> **Plaintiff**: Because . . . like, I feel that way because I see . . .when . . . whenever, like, I say something or whenever I [speak] about something, its not [taken] into consideration, but when everybody else . . . says something, needs help with something, they get it first.
>                                        . . .
>
> **Plaintiff:** [I]f [a] non-Colored kid walked up [and asked for a special education service], they would get it. . . . But I don't get that.

EC No. 41-5 at PageID.637–38, 640. But nothing in the record supports Plaintiff's vague deposition testimony. Plaintiff did not depose any other "similarly situated" MPMS students. Although both Mr. Russell and Assistant Principal Walderzak were deposed, neither testified about other MPMS special education students—let alone the services these students received or how they received them. In a record which spans over 1,000 pages and contains countless MPMS records, Plaintiff has not shown any documentation concerning any other special education student, let alone documentation which would plausibly suggest another student received different or preferential treatment compared to Plaintiff. In short, disparate treatment claims inherently involve comparison. But Plaintiff has not provided this Court with anything to compare his allegations to. Without more, Plaintiff's deposition testimony does not establish a genuine issue of

material fact as to disparate treatment, and thus is insufficient to survive summary judgment. *See Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009) ("Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment."); *Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020) ("A discrimination plaintiff's generic testimony that she was qualified for apposition, for example, does not suffice to withstand summary judgment on that . . . issue without specific facts supporting this general testimony.")

### c. Deliberate Indifference to Student-on-Student Racial Harassment

Plaintiff's third Equal Protection argument—alleging Defendant's deliberate indifference to his complaints of racial bullying—fails for a unique reason, too. "The deliberate indifference standard used for proving a § 1983 equal protection violation in peer-on-peer racial harassment cases is 'substantially the same' as the deliberate indifference standard applied in Title IX cases." *Stiles ex rel. D.S. v. Grainger Cnty.*, 819 F.3d 834, 852 (6th Cir. 2016) (quoting *Williams ex rel. Hart v. Paint Valley Local Sch. Dist.*, 400 F.3d 360, 369 (6th Cir.2005)). Accordingly, Plaintiff must show (1) Defendants had actual knowledge of the alleged racial harassment and (2) responded unreasonably. *See Williams ex rel. Hart*, 400 F.3d at 364.

Plaintiff argues that Defendants were deliberately indifferent to his complaints that he was being racially harassed or bullied by his peers. ECF No. 54 at PageID.1144–45. A distinction must be made, here, between a defendant's deliberate indifference to harassment, on one hand, and deliberate indifference to *racial* harassment, on the other. Only the latter is actionable under the Fourteenth Amendment Equal Protection clause. *See Williams v. Port Huron Sch. Dist.*, 455 F. App'x 612, 618 (6th Cir. 2012) ("Defendants must have been deliberately indifferent to the allegations of student-on-student *racial* harassment." (emphasis added)).

There are two references to peer-on-peer racial harassment in the record. First, on November 17, 2021—the same day Plaintiff punched a student in the groin—Plaintiff and his mother allege that Plaintiff was "assaulted" by this student, and two others, in an MPMS bathroom. ECF Nos. 41-5 at PageID.623; 41-4 at PageID.558–59. Plaintiff's mother adds that these three students "called [Plaintiff] multiple racial slurs" while attacking him. ECF No 41-4 at PageID.558–59. But Plaintiff expressly testified that he did not report this incident to anyone.[8] ECF No. 41-5 at PageID.623 ("I didn't cry and tell nobody about it[.]"); at PageID.635 (answering "no" when asked by counsel "[d]id you tell anybody that the kids had jumped you in the bathroom?"). Accordingly, this allegation of student-on-student racial harassment cannot serve as a basis for Plaintiff's deliberate indifference Equal Protection claim.

Second, Plaintiff testified that other MPMS students called him a "burnt marshmallow" and the "'N' word" at various times. ECF No. 41-5 at PageID.644. Unlike the incident discussed above, Plaintiff testified that he "probably" reported this name-calling to "the teachers . . . at recess" on five different occasions but that "[n]othing was done." *Id.* at 644–55. This sufficiently establishes a genuine issue of material fact as to whether Plaintiff's Fourteenth Amendment Equal Protection rights were deprived.

### 2. Individual Liability

Although a genuine issue of material fact exists as to whether some unidentified MPMS "teachers" deprived Plaintiff's Fourteenth Amendment rights, nothing suggests any of the individual Defendants did so. Plaintiff has not presented any evidence suggesting the six individual

---

[8] Notably, in response to Mr. Russell's text informing Johnson that Plaintiff was suspended for punching a student in the groin, Johnson replied that she "hope[d] the other child that punched [Plaintiff] [would] also serv[e] an in school suspension." ECF No. 42-8 at PageID.720. But nothing in this text suggested or reported racial harassment. *See id.*

Defendants (Russell, Walderzak, Weaver, Aherns, House, and Ulrich) received, or even knew about, Plaintiff's alleged reports of racial harassment. Plaintiff expressly testified that he could not remember who he reported the racial name-calling to, *id.* at PageID.655, and both Mr. Russell and Assistant Principal Walderzak—the only individual Defendants Plaintiff deposed—denied ever receiving reports that Plaintiff was bullied or subjected to racial slurs. ECF Nos. 41-3 at PageID.512; 42-1 at PageID.679. Thus, the individual Defendants cannot be liable for the alleged Equal Protection violation under 42 U.S.C. § 1983. *Pineda v. Hamilton Cnty.*, 977 F.3d 483, 491 (6th Cir. 2020) (noting that, "in the face of [a] motion for summary judgment, a § 1983 plaintiff must produce evidence supporting each individual defendant's personal involvement in the alleged violation to bring that defendant to trial" and that a "plaintiff does not meet this burden by showing only that a defendant was one of several others who may have committed the unconstitutional act" (internal quotations omitted)).

### 3. *Monell* Municipality Liability

Defendant MPPS cannot be liable for this Equal Protection Clause violation under 42 U.S.C. § 1983, either. As explained above, a municipality—like MPPS—cannot be liable for a constitutional deprivation solely because it employs someone—like the "teachers" Plaintiff reported to—who deprived a plaintiff's constitutional rights. *See supra* III.A (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691). MPPS can only be liable under *Monell* for its "official policies" which cause an employee to violate another's constitutional rights. *Monell*, 436 U.S. at 692. Although there are four "avenues" a Plaintiff may take to prove MPPS had an official policy which caused an employee to deprive Plaintiff's Fourteenth Amendment rights, Plaintiff has only pursued one: that MPPS inadequately trained and supervised its employees. ECF No. 54 at PageID.1165.

To succeed on this failure-to-train claim, Plaintiff must prove (1) the training or supervision provided to MPPS employees was inadequate for the tasks performed; (2) the inadequacy was the result of MPPS's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury. *Little v. City of Saginaw*, 674 F. Supp. 3d 376, 389 (E.D. Mich. 2023). Plaintiff's Equal Protection *Monell* claim does not survive the first step. Plaintiff has not shown that MPPS inadequately trained or supervised its employees to address, report, or resolve complaints of student-on-student racial harassment. Plaintiff instead focuses his *Monell* argument on training and supervision provided to MPPS employees concerning the *Break Room*. *See* ECF No. 54 at PageID.1166–67. Although this alleged lack of training and supervision on how to use the Break Room may be relevant to Plaintiff's *Fourth Amendment* or *Fourteenth Amendment Substantive Due Process* claims discussed below, it is inapposite here, where the core constitutional deprivation concerns how teachers respond to, report, and resolve student-on-student racial bullying.

In sum, although for different reasons, all Defendants are entitled to summary judgment on Count I, alleging a deprivation of rights secured to Plaintiff by the Fourteenth Amendment Equal Protection clause.

### B. Fourth Amendment Searches and Seizures

In Count II, Plaintiff seemingly alleges Defendants deprived him of his Fourth Amendment rights by unreasonably searching and "unjustifiably detaining" him in November 2021. *See* ECF No. 1 at PageID.10–11.

### 1. Underlying Constitutional Deprivation

The Fourth Amendment protects "persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. CONST. amend. IV. This prohibition on unreasonable searches and

seizures "applies to conduct by school officials." *Crochran through Shields v. Columbus City Sch.*, 748 F. App'x 682, 685 (6th Cir. 2018). When analyzing a Fourth Amendment claim, courts first ask whether a search or seizure occurred and, if so, whether this search or seizure was reasonable. *See Graves v. Mahoning Cnty.*, 821 F.3d 772, 775 (6th Cir. 2016) (citing *Brower v. County of Inyo*, 489 U.S. 593, 599, (1989) and *Robertson v. Lucas*, 753 F.3d 606, 618 (6th Cir.2014)). When analyzing reasonableness, courts balance, on one hand, the degree to which the search or seizure intrudes upon an individual's privacy and, on the other, the degree to which the search or seizure is necessary to effectuate a legitimate government interest. *United States v. Knights*, 534 U.S. 112, 119 (2001).

### a. November 2021 Searches

Plaintiff first argues that Mr. Russell and Assistant Principal Walderzak unreasonably "strip search[ed]" him on November 10, 2021 and November 11, 2021. *See* ECF No. 54 at PageID.1146. Defendants do not dispute that Mr. Russell and Assistant Principal Walderzak searched Plaintiff on both occasions, and instead argue only that the searches were objectively reasonable in accordance with the Fourth Amendment. ECF No. 39 at PageID.246, 262–63.

"Determining the reasonableness of any search involves a twofold inquiry." *New Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985). First, courts consider whether the search was justified at its inception. *Terry v. Ohio*, 392 U.S. 1, 20 (1968). Second, courts determine whether the search "was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* As recognized by the Supreme Court:

> Under ordinary circumstances, a search of a student by a teacher or other school official will be "justified at its inception" when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school. Such a search will be permissible in its scope when the measures adopted are reasonably related to the objectives of

the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction.

*T.L.O.*, 469 U.S. at 341–42 (footnotes omitted). Notably, the Supreme Court emphasized that the reasonable suspicion a school official needs to justify a search at its inception is something less than probable cause. *Id.* at 340–41. Indeed, the Supreme Court later clarified "[t]he lesser standard for school searches could . . . be described as a moderate chance of finding evidence of wrongdoing." *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 370 (2009).

**i.**

The searches of Plaintiff on November 10 and 11, 2021 were justified at their inception. Understandably, MPPS Policy prohibits students from possessing firearms at school. ECF No. 43-9 at PageID.853. On November 10, 2021, one of Plaintiff's classmates reported that Plaintiff told the classmate that Plaintiff brought a gun to school. ECF No. 42-1 at PageID.696–97. This gave Mr. Russell and Assistant Principal Walderzak reasonable suspicion that Plaintiff was violating school rules by possessing a dangerous firearm on MPMS grounds. *See Wofford v. Evans*, 390 F.3d 318, 326 (4th Cir. 2004) (finding reasonable suspicion for school officials to search a ten-year-old plaintiff when another student reported plaintiff brought a gun to school); *see also New Jersey v. T.L.O.*, 469 U.S. 325, 367 (1985) (Brennan, J., concurring) ("A teacher or administrator who had reasonable suspicion that a student was carrying a gun would no doubt have authority under ordinary Fourth Amendment doctrine to conduct a limited search of the student to determine whether the threat was genuine.").

Similarly, on November 11, 2021, a teacher heard Plaintiff yell "you're lucky I don't have my gun with me today!" shortly after laughing with another student who was drawing a picture of a shooting. ECF Nos. 41-10 at PageID.660; 41-3 at PageID.480. This too gave Assistant Principal Walderzak and Mr. Russell reasonable suspicion to search. *See Cuesta v. School Bd. of Miami–*

*Dade Cty.*, 285 F.3d 962, 965–69 (11th Cir. 2002) (finding violent drawings, coupled with threatening words, create reasonable suspicion).

Indeed, Plaintiff does not dispute that Mr. Russell and Assistant Principal Walderzak had reasonable suspicion to *justify* the November searches.

**ii.**

Instead, Plaintiff argues both searches were objectively unreasonable in *scope*. *See* ECF No. 54 at PageID.1140, 1146.

No reasonable jury could conclude that the November 10, 2021 search—which lasted only 12 seconds—was unreasonable in scope. On November 10, after receiving reports that Plaintiff told students he brought a gun to school, Assistant Principal Walderzak and Mr. Russell searched Plaintiff's locker and asked him to pat himself down and show the inside of his pockets. *See* ECF Nos. 42-2 at 0:09–0:21; 42-1 at PageID.698; 41-11 at PageID.662; 41-10 at PageID.660. Neither Walderzak nor Russell touched Plaintiff or asked him to remove any clothing. ECF Nos. 42-2 at 0:09–0:21. Accordingly, the November 10, 2021 search was minimally intrusive and reasonably related to the objective of identifying whether Plaintiff was armed at school. *See, e.g.*, *Salyer v. Hollidaysburg Area Sch. Dist.*, No. CV 3:16-57, 2018 WL 3579838, at *10 (W.D. Pa. July 25, 2018) (collecting cases and noting "[s]everal federal courts have held that 'pat-downs' of students suspected of possessing weapons do not violate students' Fourth Amendment rights"); *Brousseau By & Through Brousseau v. Town of Westerly By & Through Perri*, 11 F. Supp. 2d 177, 182 (D.R.I. 1998) (concluding a "pat-down" of students' pockets and ankles which lasted only "a few seconds" was not unreasonable when school officials had reasonable suspicion that one of the searched students possessed a knife); *Gallimore v. Henrico Cnty. Sch. Bd.*, 38 F. Supp. 3d 721, 725 (E.D. Va. 2014) (holding school official—who had reasonable suspicion that student possessed drugs—

did not unreasonably exceed the scope of search by patting the student down and searching locations where the drugs reasonably could have been located, such as the student's backpack and pockets).

But a genuine issue of material fact exists as to whether the scope of the November 11, 2021 search was reasonable. Like the search on November 10, Assistant Principal Walderzak and Mr. Russell searched Plaintiff's locker and asked him, in the hallway, to pat himself down and show the inside of his pockets. ECF Nos. 42-1 at PageID.702; 41-3 at PageID.481; 42-6 at 1:12–1:51. But, unlike the November 10 search, Plaintiff alleges that, immediately after the nonintrusive hallway search—which revealed Plaintiff did not possess a firearm—Mr. Russell directed Plaintiff into the special education classroom and had Plaintiff "[p]ull [his] pants down." ECF No. 41-5 at PageID.621–22. Although Mr. Russell expressly denies this, ECF No. 41-3 at PageID.478, there is a genuine issue of material fact that cannot be resolved on summary judgment. The "reasonable suspicion" which justified the search of Plaintiff on November 11, 2021 dissipated the moment Mr. Russell and Assistant Principal Walderzak concluded Plaintiff did not have a firearm in his locker, in his backpack, in his pockets, or anywhere else on his person. Any further demand that Plaintiff remove outer articles of clothing to confirm he was unarmed is far too intrusive of Plaintiff's privacy, and would exceed the scope of a reasonable search, in violation of both the Fourth Amendment and clearly established law. *See Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 377 (2009) (noting a school search "requires the support of reasonable suspicion of danger or of resort to underwear for hiding evidence of wrongdoing before a search can reasonably make the quantum leap from outer clothes and backpacks to exposure of intimate parts.").

In sum, Plaintiff has shown a genuine issue of material fact as to whether the scope of Mr. Russell's search on November 11, 2021 was objectively unreasonable, in violation of clearly

established Fourt Amendment law, such that Mr. Russell would not be entitled to qualified immunity in his personal capacity if his dispute is resolved in Plaintiff's favor. Notably, though, Plaintiff only alleges that Mr. Russell participated in this potentially unconstitutional aspect of the November 11, 2021 search. Accordingly, to the extent this claim survives summary judgment, all other individual Defendants will be dismissed.

### b. November 19, 2021 Break Room "Detention"

Plaintiff next alleges that his Fourth Amendment rights were deprived when he was unreasonably detained—or seized—in the Break Room on November 19, 2021. *See* ECF No. 1 at PageID.10–11. Similar to Fourth Amendment *searches*, courts assess the reasonableness of Fourth Amendment *seizures* using a two-step inquiry: (1) did a seizure occur and, if so (2) was it reasonable? *See Gregory v. W. Clermont Loc. Sch. Dist. Bd. of Educ.*, 414 F. Supp. 3d 1064, 1076 (S.D. Ohio 2019).

A Fourth Amendment "seizure" typically occurs when a government official—by means of physical force or show of authority—intentionally terminates or restrains a person's freedom of movement. *Brendlin v. California*, 551 U.S. 249, 254 (2007). But courts "must think about seizures differently in the school context, as students are generally not at liberty to leave the school building when they wish." *Crochran through Shields v. Columbus City Sch.*, 748 F. App'x 682, 685 (6th Cir. 2018) (quoting *Couture v. Bd. of Educ. of Albuquerque Pub. Sch.*, 535 F.3d 1243, 1250–51 (10th Cir. 2008)). Accordingly, "[t]o qualify as a seizure in the school context, the limitation on the student's freedom of movement must significantly exceed that inherent in every-day compulsory attendance." *Id.* (quoting *Couture*, 545 F.3d at 1251)).

An issue of material facts exists as to whether Plaintiff was seized while in the Break Room on November 19, 2021. According to Defendants, Plaintiff was never seized because he

entered the breakroom voluntarily and was free to leave at any time. ECF No. 39 at PageID.290. But, according to Plaintiff, Mr. Russell ordered him into the Break Room and Plaintiff was trapped inside for 20 minutes, despite his efforts to open the door from the inside. ECF No. 41-5 at PageID.624–29. Notably, Plaintiff's claim that *someone, somehow* prevented him from leaving the Break Room is *somewhat* corroborated by Mr. Russell's deposition testimony that, if he perceived a student as a "danger to themselves or others," he would "hold the handle" from the outside of the Break Room, such that "the door couldn't be opened" from the inside. ECF No. 41-3 at PageID.509. If Plaintiff was, in fact, trapped inside the Break Room—either because someone was holding the door shut from the outside or, as Plaintiff suspects, because someone placed a large metal doorstop outside the door, ECF No. 41-5 at PageID.627–29—Plaintiff's freedom of movement was significantly limited, far in excess of the limitations "inherent in every-day compulsory attendance" at school. *See Crochran through Shields v. Columbus City Sch.*, 748 F. App'x 682, 685 (6th Cir. 2018). In short, a jury could conclude Plaintiff was seized while in the Break Room on November 19, 2021.

A jury could also conclude that this seizure was unreasonable. Like Fourth Amendment *searches*, Fourth Amendment *seizures* are unreasonable if they are unjustified at their inception or unreasonable in scope. *Crochran through Shields v. Columbus City Sch*., 748 F. App'x 682, 685 (6th Cir. 2018). Here, if Plaintiff was seized, the seizure was wholly unjustified. Unlike the earlier searches based on the reasonable suspicion that Plaintiff brought a firearm to school, Mr. Russell had no reasonable suspicion, on November 19, 2021 that Plaintiff violated school rules or the law.

And Plaintiff was not displaying any behavioral issues that may have justified his placement in the Break Room in accordance with his IEP or to assuage any pedagogical concerns.[9]

Accordingly, a material question of fact exists as to whether Mr. Russell unreasonably seized Plaintiff in the Break Room on November 19, 2021 in violation of Plaintiff's clearly established Fourth Amendment rights. To the extent Plaintiff pleads this Fourth Amendment claim against any other individual Defendant, those individual Defendants are entitled to summary judgment because they are not plausibly alleged to have participated in the potentially unconstitutional conduct.

### 2. *Monell* Municipality Liability

Having concluded that Plaintiff has shown a genuine dispute of material fact concerning two Fourth Amendment violations stemming from the November 11, 2021 search and the possible November 19, 2021 Break Room seizure, this Court turns to whether MPPS can be liable under Plaintiff's "failure to train or supervise" theory of *Monell* municipality liability.

To hold MPPS liable as a municipality for either possible Fourth Amendment violation, Plaintiff must prove (1) the training or supervision provided to MPPS employees was inadequate

---

[9] It would be a closer constitutional call if, for example, Plaintiff was having a "behavioral outburst" or was actively defying Mr. Russell's instructions just before his placement in the Break Room. In *Couture v. Bd. of Educ. of Albuquerque Pub. Sch.*, the Tenth Circuit held that teachers who ordered a special education student into a "time out" room when the student was exhibiting behavioral problems did not *unreasonably* seize the student, because the use of the room was "expressly prescribed" by the student's IEP, and because the teachers' seizure was justified by the students history of behavioral problems, coupled with the teachers' need to maintain an orderly classroom. 535 F.3d 1243 (10th Cir. 2008); *see also Crochran through Shields v. Columbus City Sch.*, 748 F. App'x 682, 685 (6th Cir. 2018) (finding seizure of special education student in a "body sock" justified at inception because the student "had been acting out, and other methods of behavior correction had failed"). Indeed, the Tenth Circuit further held that using the timeout room as a way to *discipline* the student for refusing to complete work was not unreasonable in violation of the Fourth Amendment. *Couture*, 535 F.3d at 1252–53 ("If corporal punishment is a constitutionally acceptable form of discipline for a student's defiance, it is implausible that timeouts are not.").

for the tasks performed; (2) the inadequacy was the result of MPPS's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury. *Little v. City of Saginaw*, 674 F. Supp. 3d 376, 389 (E.D. Mich. 2023).

The Parties have provided little evidence for this Court to assess the adequacy of MPPS's training on searches and seizures. During his deposition, Assistant Principal Walderzak testified that he was trained "as it relates to searching students" but he could not remember when he was trained, nor what the training consisted of beyond "searching lockers and student property." ECF No. 42-1 at PageID.703–04. Mr. Russell testified that he received in-person training on how to use the Break Room at MPPS from the "Crisis Prevention Institute" sometime since 2020. ECF No. 41-3 at PageID.514. And although Defendants provided several MPPS policies governing teacher-student interactions, harassment, discrimination, and retaliation, the provided policies say nothing about how the individual Defendants—and particularly Mr. Russell—were *trained* to implement or enforce these policies. *See generally* ECF No. 43-9 at PageID.767–886.

However, even assuming a jury could reasonably conclude that MPPS's training on searches and seizures was inadequate, MPPS is still entitled to summary judgment on all viable Fourth Amendment claims because nothing in the record suggests that this assumed inadequacy was a result of MPPS' *deliberate indifference.* As the Sixth Circuit explains, a municipality is deliberately indifferent to its inadequate training only when (A) the inadequate training produces inherently foreseeable constitutional consequences, or (B) the municipality has failed to provide better or more training despite repeated complaints of constitutional violations. *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700–01 (6th Cir. 2006).

But, here, Plaintiff does not allege that there were foreseeable constitutional consequences from MPPS's allegedly inadequate training. *See generally* ECF Nos. 1; 54. And Plaintiff has not

provided any evidence of repeated constitutional complaints. Indeed, the *only* evidence Plaintiff identifies in support his *Monell* claim is that Assistant Principal Walderzak testified during his deposition that he was unaware of any MPPS Break Room policy or procedure and unsure whether Mr. Russell was trained on how to use the Break Room. ECF No. 54 at PageID.1166–67 (citing ECF No. 42-1 at PageID.694, 703–04). But Plaintiff's reliance on this testimony is misplaced because the testimony does not even plausibly suggest MPPS's deliberate indifference to any inadequate training on searches, seizures, or the Break Room. Accordingly, although two Fourth Amendment claims survive summary judgment against Mr. Russell in his personal capacity, MPPS is entitled to summary judgment on both. *See Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 701 (6th Cir. 2006) (affirming district court grant of summary judgment to school district on student's failure-to-train *Monell* claim because, even assuming inadequate training, plaintiff (1) did not allege foreseeable constitutional consequences and (2) did not provide sufficient evidence of repeated constitutional complaints).

### C. Fourteenth Amendment Substantive Due Process

Also in Count II, Plaintiff alleges Defendants Deprived him of his Fourteenth Amendment Substantive Due Process rights. *See* ECF Nos. 1 at PageID.10–11; 54 at PageID.1162–64. All Defendants are entitled to summary judgment on this claim.

First, Plaintiff's claim is not cognizable under the Fourteenth Amendment. A distinction must be made, here, between substantive due process claims involving allegations of "excessive force" on one hand, and claims involving general seizures or detentions, devoid of force, on the other. Plaintiff repeatedly conflates the two, *see* ECF No. 1 at PageID.2, likely because excessive force and unreasonable seizures are both analyzed for objective reasonableness under the *Fourth*

Amendment. *Graham v. Connor*, 490 U.S. 386, 388, 398–99. But both are analyzed quite differently under the *Fourteenth* Amendment.

Fourteenth Amendment substantive due process claims premised on detention or seizures *devoid of force* cannot lie because the Fourth Amendment provides a more concrete constitutional protection. "[W]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of governmental behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998) (internal quotations omitted). Analogous to the facts at hand, when a student plaintiff alleges they were unreasonably secluded or seized in a "break" or "time out" room at school, federal courts consistently reject general Fourteenth Amendment substantive due process claims, in favor of more specific Fourth Amendment claims.[10]

---

[10] *See, e.g.*, *Doe v. Aberdeen Sch. Dist.*, 42 F.4th 883 (8th Cir. 2022) (dismissing substantive due process claim brought by special education students against school district's use of a "little room" as a part of those students' IEPs, noting that the aspect of the claim arguing an unconstitutional detention or seizure is only cognizable under the Fourth Amendment); *T.Z. by & through P.Z. v. Tippecanoe Sch. Corp.*, No. 4:22-CV-016-PPS-JEM, 2023 WL 403773, at *13 (N.D. Ind. Jan. 25, 2023) (holding special education student's substantive due process claim alleging he was locked in a break room "can be disposed of quickly" because "[t]here is no clearly established *substantive due process* right to be free from bodily restraint and unreasonable social isolation," and noting further "where a plaintiff pursues coextensive claims under § 1983 for violations of right sunder the Fourth Amendment and the substantive due process clause of the Fourteenth Amendment, there is no need for the district court to further analyze the case under the strictures of the Fourteenth Amendment" (emphasis in original) (internal quotations omitted) (citing *Albright v. Oliver*, 510 U.S. 266, 273 (1994))); *Doe ex rel. Doe v. Hawaii Dept. of Educ.*, 334 F.3d 906 (9th Cir. 2003) (finding student's claim that teacher taped him to a tree was cognizable under the Fourth, rather than the Fourteenth Amendment); *Couture v. Bd. of Educ. of Albuquerque Pub. Sch.*, No. CV 05-972 JCH/DJS, 2007 WL 9734107, at *14 (D.N.M. May 15, 2007), *rev'd on other grounds*, 535 F.3d 1243 (10th Cir. 2008) (granting teachers summary judgment on special education student's Fourteenth Amendment substantive due process claim concerning the teacher's use of IEP "timeout" room because the claim is specifically cognizable under the Fourth Amendment); *Rasmus v. Ariz.*, 939 F. Supp. 709, 717 (D. Ariz. 1996) (same); *see also Gottlieb v. Laurel Highlands Sch. Dist.*, 272 F.3d 168, 171–72 (3d Cir. 2001) (distinguishing claims based on

On the other hand, "a student's claim of *excessive force* by a teacher is properly analyzed under the [substantive] Due Process Clause of the Fourteenth Amendment, rather than the Fourth Amendment." *Gohl v. Livonia Pub. Sch*., 134 F. Supp. 3d. 1066, 1083 (E.D. Mich. 2015), *aff'd Gohl v. Livonia Pub. Sch*. Sch. Dist., 836 F.3d 672 (6th Cir. 2016) (emphasis added); *see also Smith v. Washtenaw Intermediate Sch. Dist*., No. 17-13571, 2020 WL 409659, at *4 (E.D. Mich. Jan. 24, 2020). The key question under this framework is whether the defendant's conduct shocks the conscience. *Webb v. McCullough*, 828 F.2d 1151, 1158 (6th Cir. 1987) (quoting *Hall v. Tawney*, 621 F.2d 607, 613 (4th Cir.1980)).

Here, critically, Plaintiff has not alleged—and the record does not show—that any Defendant employed any force against Plaintiff before, during, or after Plaintiff was in the Break Room on November 19, 2021, let alone excessive force.[11] The thrust of Plaintiff's substantive due process claim is that he was unlawfully secluded in the Break Room. Indeed, Plaintiff emphasizes that he is pursuing his Break Room claim under both the "*Fourth and Fourteenth Amendments to the United States Constitution*." ECF No. 1 at PageID.10–11 (emphasis in original). But this Court already analyzed Plaintiff's Break Room claim under the specific Fourth Amendment framework, finding a triable unlawful seizure claim against Mr. Russell in his personal capacity. Plaintiff cannot have his constitutional cake and eat it, too. The broad Fourteenth Amendment substantive due process clause does not additionally apply to Plaintiff's Break Room claim, such that Defendants are entitled to summary judgment.

---

detention, to be analyzed under the Fourth Amendment, and claims based on physical force, to be analyzed under the Fourteenth Amendment).

[11] Plaintiff refers to "excessive force" once in his Complaint, when describing his allegations in the Introduction. ECF No. 1 at PageID.2. But Plaintiff has never specified *what* this alleged excessive force was, *when* he was subject to it, and *who* subjected him to it.

In the alternative, even if this Court considered Plaintiff's substantive due process claim, Defendants would similarly be entitled to summary judgment on the merits. The Sixth Circuit has adopted a four-factor test to determine whether a school-staff defendant's conduct is "so brutal, demeaning, and harmful" that it "literally . . . shock[s] the conscience:"

(1) Was there a pedagogical justification for the use of force?;
(2) Was the force utilized excessive to meet the legitimate objective in this situation?;
(3) Was the force applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm?; and
(4)  Was there a serious injury?

*Domingo v. Kowalski*, 810 F.3d 403, 411 (6th Cir. 2016) (citing *Gottlieb v. Laurel Highlands Sch. Dist.*, 272 F.3d 168 (3rd Cir. 2001)).

Here, although material questions of fact permeate the first two factors, no reasonable juror could find for Plaintiff on the latter two. As explained, a genuine dispute of material fact exists as to whether Plaintiff voluntarily walked into the Break Room on November 19, 2021 or whether Mr. Russell placed him there, without pedagogical justification, to retaliate against Plaintiff for punching a student in the groin two days prior. *See supra* Section I.E. But, even if this dispute is resolved in Plaintiff's favor, Plaintiff has not argued, let alone shown, that Mr. Russell "maliciously and sadistically" placed Plaintiff in the Break Room "for the very purpose of causing [Plaintiff] harm." *Domingo*, 810 F.3d at 411. And any suggestion of malice or harmful intent is undercut by the undisputed fact that Mr. Russell ensured Plaintiff brought breakfast into the Break Room, ECF Nos. 41-3 at PageID.491, 499, 503–04; 41-4 at PageID.568; 41-5 at PageID.625, and that Plaintiff was able to text and call his mom. *See* ECF No. 42-10.

Moreover, Plaintiff has presented no evidence that the Break Room caused him "serious injury." *Domingo*, 810 F.3d at 411. In his Complaint, Plaintiff alleges the Break Room caused him "physical injuries, pain, suffering, emotional distress, mental anguish, posttraumatic stress

disorder, injuries to his reputation, humiliation, and embarrassment." ECF No. 1 at PageID.10–11.

But the record has not substantiated any injury allegation whatsoever. There is no evidence that

Plaintiff was physically injured before, during, or after being in the Break Room on November 19,

2021. Indeed, the medical records Plaintiff provides from after the Break Room incident reflect

that Plaintiff had strep throat, not post-traumatic stress disorder. ECF No. 43-2 at PageID.734–35.

The *only* evidence of Plaintiff's injuries is Plaintiff's own deposition testimony that he felt "lonely

and scared kind of" when he was in the Break Room. ECF No. 41-5 at PageID.627. This is

insufficient to show a substantive due process violation. *See Lambeth-Greer v. Farmington Pub.

Sch.*, No. 21-CV-10752, 2023 WL 6932522, at *9 (E.D. Mich. Oct. 19, 2023) (noting the burden

of establishing injury severity is "demanding" and dismissing a student's substantive due process

claim because she "fail[ed] to provide any . . . evidence supporting" her allegations of post-

traumatic stress and other phycological injuries); *Domingo v. Kowalski*, 810 F.3d 403, 416 (6th

Cir. 2016) (dismissing special education students' substantive due process claim against teacher

who "gag[ed] one student with a bandanna," and forced another student to sit on a training toilet

with her pants down in front of her classmates because special education students "presented no

evidence of any serious injury, physical or otherwise").

In sum, all Defendants are entitled to summary judgment on Plaintiff's substantive due

process claim, both because the claim is not cognizable under the Fourteenth Amendment and

because, even if it was, the record does not reveal any "conscience shocking" conduct.

### IV. Plaintiff's Federal Statutory Claims

In addition to his Constitutional claims, Plaintiff alleges three violations of interrelated

federal statutes and regulations, all based on similar arguments. In Count VIII, Plaintiff alleges

Defendants violated the Individuals with Disabilities Education Act (IDEA) by denying him a free

appropriate public education (FAPE) because Defendants did not annually update and implement his IEP. ECF No. 1 at PageID.18–19. In Count IX, Plaintiff alleges that Defendants violated Section 504 of the Rehabilitation Act by "failing to properly educate him" because his "IEP . . . was not followed" nor "annually update[d]." *Id.* at PageID.19–20. And, in Count XI, duplicative of Count VIII, Plaintiff alleges that Defendants violated the IDEA by "fail[ing] to provide" him with a FAPE, because they "failed to annually update [his] IEP" and did not "properly implement it." *Id.* at PageID.21–22. Counts VIII and XI fail for lack of exhaustion, and Count IX fails on the merits.

## A.  Statutory Background

"In exchange for federal funding, the IDEA requires states to identify, locate, and evaluate 'all children residing in the State who are disabled . . . and who are in need of special education and related services.'" *Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 762 (6th Cir. 2001) (citing 20 U.S.C. § 1412(2)(C)). States must provide all special education students with a FAPE, 20 U.S.C. § 1401(a)(18), and must develop IEPs for each student to receive IDEA funding. *Id.* (citing 20 U.S.C. § 1414(a)(5)). Indeed, a special education student's IEP serves as the "primary vehicle" ensuring the student is provided with a FAPE. *Honig v. Doe*, 484 U.S. 305, 311 (1988).

But, "[b]ecause parents and school representatives sometimes" disagree on about aspects of a student's IEP, "the IDEA establishes formal procedures for resolving disputes." *Fry v. Napoleon Cmty. Sch.*, 580 U.S. 154, 159 (2017). As summarized by the Supreme Court:

> To begin, a dissatisfied parent may file a complaint as to any matter concerning the provision of a FAPE with the local or state educational agency (as state law provides). That pleading generally triggers a preliminary meeting involving the contending parties, at their option, the parties may instead (or also) pursue a full-fledged mediation process. Assuming their impasse continues, the matter proceeds to a due process hearing before an impartial hearing officer. Any decision of the officer granting substantive relief must be based on a determination of whether the child received a FAPE. If the hearing is initially conducted at the local level, the

ruling is appealable to the state agency. Finally, a parent unhappy with the outcome of the administrative process may seek judicial review by filing a civil action in state or federal court.

*Id.* (internal quotations and citations omitted); *see also* 20 U.S.C. § 1415.

"Important as the IDEA is for children with disabilities, it is not the only federal statute protecting their interests." *Id.* Relevant here, Section 504 of the Rehabilitation Act ("Section 504") requires public schools to reasonably modify their existing practices to accommodate students with disabilities. 29 U.S.C. § 794. Like the IDEA, Section 504 also authorizes private rights of action against schools and school officials when an individual feels their educational rights have been violated. 29 U.S.C. § 794a(a)(2).

Historically, when a plaintiff—like Plaintiff here—pursued virtually identical claims under *both* the IDEA and Section 504, the former IDEA claim altogether foreclosed the additional Section 504 claim, such that only the IDEA claim was cognizable. *See generally Smith v. Robinson*, 468 U.S. 992 (1984). But, in 1986, Congress passed the Handicapped Children's Protection Act which "overturned *Smith*'s preclusion of non-IDEA claims while also adding a carefully defined exhaustion requirement." *Fry v. Napoleon Cmty. Sch.*, 580 U.S. 154, 161 (2017). This addition provided:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

20 U.S.C. § 1415(l).

In simpler terms, this provision "requires that a plaintiff exhaust the IDEA's procedures before filing an action under the ADA, the Rehabilitation Act, or similar laws when (but only

when) her suit 'seek[s] relief that is also available' under the IDEA." *Fry*, 580 U.S. at 165. Two

Supreme Court cases have clarified this rule. In *Fry v. Napoleon Cmty. Sch.*, 580 U.S. 154 (2017),

the Supreme Court held, generally, that the IDEA's exhaustion requirement applies to non-IDEA

claims which seek relief for the alleged denial of a FAPE, because that relief is expressly provided

by the IDEA. However, in *Luna Perez v. Sturgis Pub. Sch.*, 598 U.S. 142 (2023), the Supreme

Court recently established an exception to this general rule: a non-IDEA claim—even one

premised on the alleged denial of FAPE—need not comply with the IDEA's exhaustion

requirements if the claim expressly seeks compensatory damages, because this form of "relief" is

not provided by the IDEA.

### B. Exhaustion

Here, Defendants are entitled to summary judgement on Counts VIII and XI because both

are express IDEA claims alleging Defendant's failure to provide Plaintiff with a FAPE,[12] *see* ECF

No. 1 at PageID.18–19, 22–23, and Plaintiff has not shown any evidence that he complied with

the IDEA exhaustion which requires—at bottom—the filing of a complaint with a local or state

education agency before seeking relief in federal court. *See Fry*, 580 U.S. 154, 159 (2017); 20

U.S.C. § 1415.

Count IX, on the other hand, does not require IDEA exhaustion. True, like Counts VIII and

XI, Count IX—pursued under Section 504—seeks relief solely for Defendant's alleged denial of

a FAPE. *See* ECF No. 1 at PageID.21–22 (alleging Defendants "fail[ed] to properly educate"

---

[12] Counts VIII and XI are duplicative. *Compare* ECF No. 1 at PageID.18–19 (labeling Count VIII "Failure to Educate & Follow Procedure in Violation of Free Appropriate Public Education," and alleging all Defendants "failed to provide [Plaintiff] with a free appropriate public education" because they failed to update and implement Plaintiff's IEP) *with* ECF No. 1 at PageID.21–22 (labeling Count XI "Failure to Education & Follow Procedure in Violation of the Individuals with Disabilities" and alleging "Defendants failed to provide [Plaintiff] with an appropriate education" because they failed to update and implement Plaintiff's IEP).

Plaintiff by failing to update and implement his IEP). However, Plaintiff seeks compensatory damages on this claim, *id.* at PageID.2, 24, and this specific "remedy" is not "relief" available under the IDEA. *See Luna Perez v. Sturgis Pub. Sch.*, 598 U.S. 142, 148 (2023) ("Admittedly, our interpretation treats 'remedies' . . . as synonymous with the 'relief' a plaintiff 'seeks' [under 20 U.S.C. § 1415(l)]."). Exhaustion aside, Defendants are still entitled to summary judgment on Count IX, because Plaintiff has not shown any triable issue on his Section 504 disability discrimination claim.

### C. Section 504 Disability Discrimination

Section 504 of the Rehabilitation Act ensures disabled individuals have the opportunity to participate in or benefit from the aid, benefit, or service of any program receiving financial assistance, such as public schools. *See* 29 U.S.C. § 794(a). To survive summary judgment on a disability discrimination claim under Section 504, a Plaintiff must show:

(1) The plaintiff was a "handicapped person" under the Act;
(2) The plaintiff was "otherwise qualified" for participation in the program;
(3) The plaintiff was excluded from participation in, denied the benefits of, or discriminated under the program solely because of his or her disability;
(4) The relevant program or activity was federally-funded

*See G.C. v. Owensboro Pub. Sch.,* 711 F.3d 623, 635 (6th Cir. 2013); *Campbell v. Bd. of Educ. of Centerline Sch. Dist.,* 58 F. Appx. 162, 165 (6th Cir.2003). The third factor proves fatal for Plaintiff.

A plaintiff may show disability discrimination—the third element of a Section 504 claim—under two different theories. *Knox Cnty. v. M.Q.,* 62 F.4th 978, 1000 (6th Cir. 2023). Under the first "intentional discrimination" theory, a plaintiff must show that the defendant treated him or her less favorably because of his or her disability, and had a discriminatory motive for doing so. *Id.* Under the second "failure-to-accommodate" disability discrimination theory, a plaintiff must

show (a) the defendant reasonably could have accommodated his disability but refused to do so; (b) this failure to accommodate impeded the plaintiff's ability to participate in, or benefit from, the subject program; (c) the requested accommodation was reasonable; and (d) the provided accommodation was unreasonable. *Id.* Moreover, when reviewing this latter "failure-to-accommodate" disability discrimination claim, courts defer to "school administrators' educational expertise in reviewing the reasonableness of their selected accommodations." *Id.*

Plaintiff does not allege that any Defendant intentionally discriminated against Plaintiff because of his disability, nor does the record plausibly support such a conclusion. *See* ECF Nos. 1 at PageID.20; 54 at PageID.1173. Instead, under a failure-to-accommodate theory, Plaintiff argues that Defendants violated Section 504 because they did not annually update or properly implement his IEP. ECF No. 1 at PageID.20. But Defendants reviewed and amended Plaintiff's IEP multiple times each year, from the time Plaintiff first received his IEP as a third grader in December 2018, through Plaintiff's withdraw from MPPS as a sixth grader in 2021. ECF Nos. 39-7 (April 2019 Amendment); 39-9 (October 2019 Amendment); 39-11 (January 2020 Annual Review); 40-5 (October 2020 Amendment); 40-7 (December 2020 Annual Review); 40-9 (May 2021 Annual Review). And although Plaintiff does not identify *how* he believes Defendants improperly implemented his IEP,[13] nothing in the record suggests improper implementation nor Defendants'

---

[13] Plaintiff's Complaint, ECF No. 1, and Response in Opposition to Summary Judgment, ECF No. 54, do not identify how or why Plaintiff believes Defendants improperly implemented his IEP. Instead, Plaintiff's mother, Cheyenne Johnson, testified at her deposition that *she* believed Plaintiff's IEP "wasn't being followed" because Plaintiff "wasn't receiving his walking breaks," assistive technology, help with assignments, or a reduced workload. ECF No. 41-4 at PageID.584. But Plaintiff's IEP never provided Plaintiff with "walking breaks" or general "help with assignments." *See* ECF Nos. 39-7; 39-9; 39-11; 40-5; 40-7; 40-9. And Plaintiff himself testified that he never asked for "walking breaks." ECF No. 41-5 at PageID.633. Although Plaintiff's IEP does provide him with speech-to-text assistive technology, ECF No. 40-9 at PageID.432, nothing in the record plausibly suggests Defendants ever failed to accommodate. MPMS provided special education students with "speech-to-text" services through Google Chromebooks located in Mr.

failure to accommodate. Plaintiff has not shown disability discrimination sufficient for his Section 504 claim to survive summary judgment.

In sum, Plaintiff asserts three federal statutory claims. Counts XIII and XI—both pursued under the IDEA—fail for lack of IDEA exhaustion. Although Count IX—pursued under Section 504 of the Rehabilitation Act—is not subject to IDEA exhaustion, it nevertheless fails on the merits, because no reasonable juror could conclude that any Defendant discriminated against Plaintiff on the basis of Plaintiff's disability. All Defendants are entitled to summary judgment on these three Counts of Plaintiff's Complaint.

## V. Plaintiff's State Statutory Claims

Onto state law. In addition to his federal claims discussed above, Plaintiff alleges Defendants violated four separate Michigan statutes. Each statutory claim will be discussed in turn.

### A. Elliott-Larsen Civil Rights Act

In Count IV, Plaintiff alleges all Defendants violated Michigan's Elliott-Larsen Civil Rights Act (ELCRA), MICH. COMP. LAWS § 37.2202 *et seq.*, by discriminating against him on the basis of his race. ECF No. 1 at PageID.14–15. But Plaintiff's ELCRA racial discrimination claim fails for the same reason his Fourteenth Amendment Equal Projection racial discrimination claim fails: Plaintiff has not shown any evidence that any Defendant intentionally discriminated against him on the basis of his race. *See supra* Section III.B.1; *Stewart v. Cnty. of Saginaw*, No. 1:22-CV-

---

Russell's special education classroom, which all students—including Plaintiff—could use and take home to complete assignments. ECF No. 41-7 at PageID.651; *see also* ECF No. 41-4 at PageID.584. Moreover, although Plaintiff's IEP did, at one point, provide Plaintiff with a 25% reduced workload, ECF No. 40-9 at PageID.432, Plaintiff's IEP team expressly removed this accommodation from Plaintiff's IEP because Johnson herself—a member of the IEP team— "expressed concern that this accommodation was not allowing [Plaintiff] to be challenged enough," "want[ed] him to be responsible for 100% of assignments," and "beleiv[ed] that [Plaintiff's] extended time accommodation [was] sufficient." ECF No. 41-6 at PageID.649.

10766, 2024 WL 2853276, at *21 (E.D. Mich. June 5, 2024) (collecting cases and noting "ELCRA discrimination claims are analyzed using the same elements as those claims brought under . . . § 1983 and the Fourteenth Amendment"). Defendants are accordingly entitled to summary judgment on Count IV.

### B. Ethnic Intimidation

Next, in Count V, Plaintiff alleges all Defendants maliciously "threatened" and "physical[ly] contact[ed]" him with the specific intend to intimidate or harass him because of his race, in violation of Michigan's prohibition against "ethnic intimidation," MICH. COMP. LAWS § 750.147b. ECF No. 1 at PageID.15–16.

Michigan's ethnic intimidation statute largely addresses criminal—as opposed to civil— liability, providing:

> A person is guilty of ethnic intimidation if that person maliciously, and with the specific intent to intimidate or harass another person because of that person's race, color, religion, gender, or national origin, does any of the following:
> (a) Causes physical contact with another person.
> (b) Damages, destroys, or defaces any real or personal property of another person.
> (c) Threatens, by word or act, to do an act described in subdivision (a) or (b), if there is reasonable cause to believe that [such acts] will occur.

MICH. COMP. LAWS § 750.147b(1).

However, the statute also proves that, "[r]egardless of the existence or outcome of any criminal prosecution, a person who suffers injury to his or her person or damage to his or her property as a result of ethnic intimidation may bring a civil cause of action against the person who commits the offense[.]" *Id.* § 750.147b(3).

Notably, "[t]here is little case law applying § 750.147b at all, and an even greater dearth of authority applying the statute in a civil action." *Austin v. Redford Twp. Police Dep't*, 859 F. Supp. 2d 883, 908 (E.D. Mich. 2011), *aff'd*, 690 F.3d 490 (6th Cir. 2012). Regardless, a plaintiff alleging

ethnic intimidation in violation of § 750.147b must show defendants (1) had the specific intent to harass or intimidate plaintiff on the basis of his or her race; (2) caused physical contact with plaintiff or threatened to do so; and (3) injured plaintiff or damaged plaintiff's property. *Id.*; *Dumas v. Hurley Med. Ctr.*, 837 F. Supp. 2d 655, 664 (E.D. Mich. 2011). No element is evidenced here.

As this Court has explained, nothing in the record suggests any Defendant intended to *discriminate* against Plaintiff on the basis of his race. *See supra* Section III.B.1. Nothing suggests any Defendant intended to *harass or intimidate* him on the basis of his race, either. Plaintiff broadly argues that this intent is somehow shown through Plaintiff's testimony that he was "treated differently than white students"—which this Court already dismissed as entirely unsupported by the record, *see supra* Section III.B.1.b. But how does this unsupported disparate treatment testimony reveal Defendants' intent to harass or intimidate? This Court does not know because Plaintiff does not say.

Second, no Defendant "caused physical contact" with Plaintiff at any time, let alone maliciously. No Defendant threatened to cause physical contact with Plaintiff, either. Plaintiff does not disagree, and instead argues that all "disabled students" at MPMS lived under a constant, "implicit threat of being placed in" the Break Room. ECF No. 54 at PageID.1170. Again, Plaintiff relies on sweeping, conclusive arguments made in his pleadings rather than concrete evidence in the record. No other MPMS special education students were deposed in this case. Plaintiff has not provided any evidence that any other special education student was placed in the Break Room, or was fearful of this placement. Indeed, Plaintiff himself did not testify that he was, or even felt, threatened that he would be placed in the Break Room at any time. Plaintiff cannot simply invent a threat out of thin air to survive summary judgment.

Lastly, as discussed, Plaintiff has not shown that any action of any Defendant injured him in any way. *See supra* Section III.C ("There is no evidence that Plaintiff was physically injured before, during, or after being in the Break Room on November 19, 2021.").

Accordingly, all Defendants are entitled to summary judgment on Plaintiffs' "ethnic intimidation" claim.

### C. Mandatory Special Education Act

In Count X, Plaintiff tries his "failure to educate" argument again, this time under a state, rather than federal, statute. Specifically, Plaintiff alleges Defendants violated the Michigan Mandatory Special Education Act (MMSEA),[14] MICH. COMP. LAWS § 380.1701 *et seq.* by failing to annually update and properly implement his IEP. ECF No. 1 at PageID.20–21. But, as discussed, Defendants consistently updated Plaintiff's IEP, and Plaintiff has not alleged—let alone shown— that any Defendant failed to provide Plaintiff with the services his IEP guaranteed. *See supra* Section IV.C, n. 13; ECF Nos. 39-7; 39-9; 39-11; 40-5; 40-7; 40-9. Defendants' Motion for Summary Judgment will accordingly be granted to the extent it seeks dismissal of Count X.

### D.  School Seclusion and Restraint Public Acts

In Count XII, Plaintiff alleges that Defendants violated Michigan Public Act 394 of 2016. ECF No. 1 at PageID.23–24. But Public Act 394 does not provide Plaintiff with a private cause of action, so Count XII will be dismissed.

---

[14] Michigan enacted the MMSEA to implement the federal requirements of the IDEA. *Zdrowski v. Rieck*, 119 F. Supp. 3d 643, 670 (E.D. Mich. 2015). Notably, although the MMSEA "differs from the IDEA in that it requires the state to create special education programs and services designed to develop the 'maximum potential' of every handicapped person," the MMSEA does not require the best education possible, nor does it require a model education or that a school adopt the most sophisticated pedagogical methods. *Renner v. Bd. of Educ. of Pub. Sch. of City of Ann Arbor*, 185 F.3d 635, 645 (6th Cir. 1999).

Public Act 394 required the Michigan Department of Education and public school districts throughout Michigan to promulgate uniform policies on emergency seclusion and restraint in school. MICH. COMP. LAWS § 380.1307. Subsumed within Michigan's Revised School Code and codified at MICH. COMP. LAWS §§ 380.1307, 380.1307a–h, Public Act 394 requires such policies to contain the following:

(1) Provisions prohibiting certain extreme forms of restraint and seclusion, such as corporal punishment, child abuse, non-emergency seclusion, mechanical and chemical restraints, and restraints that prevent a student from breathing, MICH. COMP. LAWS § 380.1307b;

(2) Provisions outlining when seclusion or physical restraint is warranted by emergencies; the permissible scope of emergency seclusion and restraint; and how certain school personnel should be trained on emergency restraint and seclusion, *id.* § 380.1307c;

(3) Seclusion and restraint reporting requirements, including the requirement that the school district report any instance of seclusion or restraint to the students' parents and guardians, *id.* § 380.1307d;

(4) Provisions outlining when a school may develop emergency intervention plans for students who frequently create emergency situations requiring seclusion and restraint, *id.* § 380.1307e;

(5) Provisions concerning the school district's collection of restraint and seclusion data, *id.* § 380.1307f; and

(6) Provisions requiring school staff enroll in a "comprehensive training framework" on school seclusion and restraint, *id.* § 380.1307g.

But Plaintiff cannot pursue a claim under Public Act 394. On this Court's review, no plaintiff—in state or federal court—has ever attempted to sue a school district and officials for violating Public Act 394. Under Michigan law, a state statutory claim "must be dismissed" unless (1) the statute "expressly" provides a private cause of action; or (2) alternative means of enforcement are inadequate. *Forster v. Delton Sch. Dist.*, 440 N.W.2d 421, 423 (Mich. Ct. App.

1989); *see also Stegall v. Res. Tech. Corp.,* No. 165450, 2024 WL 3503503, at *7 (Mich. July 22, 2024).

Under its plain terms, Public Act 394 does not expressly provide a private cause of action for students or their parents to enforce alleged violations of the Act. *See* Mich. Comp. Laws §§ 380.1307a–h. And Plaintiff has not shown that alternative means or enforcement are inadequate. Nor could he. Michigan state courts and this Court routinely recognize that Mich. Comp. Laws § 380.1804 provides an adequate, "general enforcement provision that applies to the entire Revised School Code."[15] *Johnson v. Detroit Fed'n of Tchrs.,* No. 256289, 2006 WL 167698, at *6 (Mich. Ct. App. Jan. 24, 2006); *Summer v. Southfield Bd. of Educ.,* 874 N.W.2d 150, 160 (Mich. Ct. App. 2015); *see also Garden City Educ. Ass'n v. Sch. Dist. of City of Garden City,* 975 F. Supp. 2d 780, 785 (E.D. Mich. 2013) (holding plaintiff lacked statutory standing to sue under amendment to Michigan's Revised School Code because the amendments did not provide a private cause of action and § 380.1804 is an adequate "general enforcement provision that applies to the entire Revised School Code").

Count XII will accordingly be dismissed.

## VI. Plaintiff's Tort Claims

Onto torts. In Counts VI and VII, Plaintiff asserts the common law torts of intentional infliction of emotional distress, and "assault & battery," respectively. ECF No. 1 at PageID.16–18. Notably, Plaintiff's Complaint does not identify any specific allegedly tortious conduct of any specific individual Defendant. Instead, the Complaint vaguely alleges that *all* Defendants'

---

[15] Michigan's Revised School Code provides that any school official who "neglects or refuses to do or perform" anything required by the Code "is guilty of a misdemeanor punishable by a fine not more than $500.00, or imprisonment for not more than 3 months, or both." Mich. Comp. Laws § 380.1804.

nondescript "acts" and "conduct" "constitute intentional infliction of emotional distress" and, relevant to Plaintiff's assault and battery claim, alleges that *all* "Defendants made an intentional and unlawful threat to do bodily injury to Plaintiff." ECF No. 1 at PageID.16–18. Plaintiff's Response in opposition to summary judgment clarifies that his assault and battery claim concerns Mr. Russell and Assistant Principal Walderzak's November 2021 searches, and Plaintiff's placement in the Break Room on November 19. ECF No. 54 at PageID.1172. But Plaintiff provides no further clarity on his intentional infliction of emotional distress claim. *See id.* Because Plaintiff has not plausibly alleged—and the record does not plausibly support—a tort claim against individual Defendants Ulrich, Weaver, Aherns, and House, these Defendants are entitled to summary judgment on Counts VI and VII. The analysis that follows applies only to Defendants MPPS, Walderzak, and Russell.

## A.  GTLA Immunity

The Michigan Governmental Tort Liability Act (the "GTLA"), MICH. COMP. LAWS § 691.1407 *et seq.*, shields government officials from tort liability to different extents, depending on the type of official alleged to have committed a tort. Accordingly, each Defendant here is subject to a different GTLA analysis.

Turning first to municipalities, the GTLA provides absolute tort immunity to "government agencies" that are "engaged in the exercise or discharge of a government function." MICH. COMP. LAW § 691.1407(1). Defendant MPPS is indisputably a "government agency" for the purposes of the GTLA and was engaged in "governmental functions" at all times relevant to Plaintiff's Complaint. *See* MICH. COMP. LAWS § 691.1401(a) (defining "government agency" as the state itself or any political subdivisions), (b) (defining "governmental function" as activities "expressly or impliedly mandated or authorized by constitution, statute, local charter or ordinance, or other

law"); *see also One by Monteleone v. Macomb Cnty. Intermediate Sch. Dist.*, No. 360958, 2023 WL 2620416, at \*4 (Mich. Ct. App. Mar. 23, 2023) ("There is no dispute that a school district . . . is a political subdivision of the state, i.e., a government agency, under the GTLA" and that a school district's operation "of its public school's special education program constitutes a government function."). Accordingly, Defendant MPPS is immune from Plaintiff's common law tort claims.

Turning next to individuals, the Michigan Supreme Court clarified the test to apply when an individual government-defendant asserts immunity under the GTLA:

(1) Determine whether the individual is a judge, a legislator, or the highest-ranking appointed executive official at any level of government who is entitled to absolute immunity under MICH. COMP. LAWS § 691.1407(5).[16]

(2) If the individual is a lower-ranking governmental employee or official, determine whether the plaintiff pleaded an intentional or a negligent tort.

(3) If the plaintiff pleaded a negligent tort, proceed under MICH. COMP. LAWS § 691.1407(2) and determine if the individual caused an injury or damage while acting in the course of employment or service or on behalf of his governmental employer and whether:
   (a) the individual was acting or reasonably believed that he was acting within the scope of his authority
   (b) the governmental agency was engaged in the exercise or discharge of a governmental function, and
   (c) the individual's conduct amounted to gross negligence that was the proximate cause of the injury or damage.

(4) If the plaintiff pleaded an intentional tort, determine whether the defendant established that he is entitled to individual governmental immunity by showing the following:
   (a) the acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority,
   (b) the acts were undertaken in good faith, or were not undertaken with malice, and
   (c) the acts were discretionary, as opposed to ministerial.

---

[16] Subsection (5) entitles judges, legislators, and high-rank executives with immunity from *all* tort claims if the official was "acting within the scope of his or her judicial, legislative, or executive authority." MICH. COMP. LAWS § 691.1407(5).

*See Odom v. Wayne County*, 760 N.W.2d 217, 228 (Mich. 2008).

Applying the *Odom* framework, neither Mr. Russell nor Assistant Principal Walderzak—the only two individual Defendants plausibly implicated by Plaintiff's unclear tort claims—are the type of high-ranking executive officials entitled to absolute immunity under MICH. COMP. LAWS § 691.1407(5).

Intentional infliction of emotional distress, assault, and battery are all intentional torts under Michigan law. *See Shumate v. City of Adrian*, 44 F.4th 427, 450 (6th Cir. 2022); *Graham v. Ford*, 604 N.W.2d 713, 716 (Mich. Ct. App. 1999); MICH. COMP. LAWS § 600.8424. At all times relevant to Plaintiff's two tort claims, as Plaintiff concedes, Assistant Principal Walderzak and Mr. Russell were acting, or reasonably believed they were acting, in the course of their employment with MPPS. ECF No. 54 at PageID.1171. Their alleged tortious conduct—searching and possibly seizing Plaintiff—was discretionary, as opposed to ministerial. *See Odom*, 760 N.W.2d at 226 (noting discretionary acts—such as reasonable suspicion determinations—involve personal deliberation, decision, and judgment).

Turning to the crux of the individual tort immunity analysis, Plaintiff has not shown any evidence suggesting *Assistant Principal Walderzak* maliciously searched Plaintiff. Indeed, the record reflects Assistant Principal Walderzak searched Plaintiff on November 10 and 11, 2021 in good faith. *See supra* Section I.B; Section I.C. (noting that, throughout both November searches, Assistant Principal Walderzak did not touch Plaintiff and did not ask Plaintiff to lift or remove any articles of clothing, and instead quickly searched Plaintiff's locker and asked Plaintiff to pat himself down after multiple reports that Plaintiff made multiple comments about a firearm). On the other hand, a reasonably jury could conclude that *Mr. Russell's* alleged conduct toward Plaintiff was malicious, or lacked good faith. *See supra* Section I.B (noting the genuine dispute as

to whether Mr. Russell required Plaintiff to pull his pants down on November 11 once the two were inside the special education classroom, immediately after Russell and Walderzak had confirmed Plaintiff did not have a gun on his person or in his locker); Section I.E. (noting the genuine dispute as to whether Mr. Russell placed and enclosed Plaintiff in the Break Room without justification on November 19, 2021).

In sum, Defendants MPPS and Assistant Principal Walderzak are immune from Plaintiff's two tort claims, but Mr. Russell is not.

## B. IIED

Turning to the merits of Plaintiff's tort claims against Mr. Russell, no reasonable juror could conclude that Mr. Russell intentionally inflicted Plaintiff with emotional distress.

Notably, "intentional infliction of emotional distress[] has a curious history in Michigan jurisprudence." *Eaton Pine Vill. v. Jackson*, No. 224572, 2002 WL 1360397, at *5 (Mich. Ct. App. June 21, 2002). The "modern Michigan Supreme Court has consistently avoided recognizing that intentional infliction of emotional distress exists as a cause of action[.]" *Id.*; *see also Melson ex rel. Melson v. Botas*, 863 N.W.2d 674 (Mich. 2015) (Markman, J., dissenting) ("Michigan is one of only two states whose highest court has not dispositively addressed the establishment, and the contours, of the tort of intentional infliction of emotional distress[.]"). But both the Michigan Court of Appeals and this Court routinely recognize intentional infliction of emotional distress and have clarified the claim's contours. *Id.*; *Parker v. Midwest Loan Servs., Inc.*, No. 15-11708, 2016 WL 1242440, at *3 (E.D. Mich. Mar. 30, 2016). To succeed on his intentional infliction of emotional distress claim, Plaintiff must show (1) Mr. Russell engaged in "extreme and outrageous conduct;" (2) intended to subject Plaintiff to emotional distress; and (3) caused Plaintiff (4) severe emotional

distress. *See Parker*, 2016 WL 1242440, at *3; *Hayley v. Allstate Ins. Co*., 577, 686 N.W.2d 273, 276 (Mich. Ct. App. 2004).

The final factor is fatal for Plaintiff. Even assuming a jury may reasonably conclude that Mr. Russell engaged in "extreme and outrageous conduct" by searching or seizing Plaintiff in November 2021, *see Doe v. Mills*, 536 N.W.2d 824, 833 (Mich. Ct. App. 1995) (defining "extreme and outrageous conduct" as conduct which "go[es] beyond all possible bounds of decency," and is "atrocious and utterly intolerable in a civilized community"), Plaintiff has not shown *any* evidence that he suffered severe emotional distress. The only evidence of Plaintiff has provided in support of his injury is his own deposition testimony that he was "lonely and scared kind of" when he was in the Break Room on November 19, 2021, ECF No. 41-5 at PageID.627, and that he was diagnosed with strep throat on December 2, 2021, ECF No. 43-2 at PageID.735. This is insufficient to show "severe emotional distress" necessary to succeed on an intentional infliction of emotional distress claim. *See Roberts v. Auto-Owners Ins. Co*., 374 N.W.2d 905, 908, 911 (Mich. 1985) (rejecting intentional infliction of emotional distress claim when the only evidence of plaintiff's "severe emotional distress" was his own testimony that he was "upset" and "mad;" and explaining intentional infliction of emotional distress claims will only lie when plaintiff presents evidence that "the distress inflicted is so severe that no reasonable man could be expected to endure it").

In sum, Mr. Russell is entitled to summary judgment on Count Vi of Plaintiff's Complaint, alleging intentional infliction of emotional distress.

### C. Assault and Battery

In Count VII, Plaintiff alleges Mr. Russell committed the tort of "assault & battery" by searching Plaintiff on November 11, 2021, and placing him in the Break Room on November 19, 2021. *See* ECF No. 54 at PageID.1171–72.

Michigan law defines battery as the "willful, harmful, or offensive touching of the plaintiff[.]" *Janetsky v. Cnty. of Saginaw*, No. 346542, 2023 WL 6322639, at *4 (Mich. Ct. App. Sept. 28, 2023) (quoting *Espinoza v. Thomas*, 472 N.W.2d 16, 21 (Mich. Ct. App. 1991)). Relatedly, tortious assault is defined as "any intentional unlawful offer of corporal injury to another person by force, or force unlawfully directed toward the person of another, under circumstances which create a well-founded apprehension of imminent contact, coupled with the apparent present ability to accomplish the contact." *Espinoza*, 472 N.W.2d at 21; *see also People v. Johnson*, 284 N.W.2d 718 (Mich. 1979) (tortious assault requires the tortfeasor "either have intended to commit a battery or to cause in the plaintiff an apprehension of a battery" (quotation marks and citation omitted)).

Here, Plaintiff has not alleged that Mr. Russell physically touched him—let alone willfully, harmfully, or offensively. Thus, Mr. Russell accordingly cannot be liable for battery. And, despite his conclusory allegations, Plaintiff has not provided any evidence which would plausibly suggest he was ever in reasonable apprehension of immediate harmful contact, nor has Plaintiff shown that Mr. Russell intended to make Plaintiff reasonably apprehensive. *See* ECF No. 54 at PageID.1171–72. So, Mr. Russell is similarly not liable for assault, such that he—like all Defendants—is entitled to summary judgment on Count VII.

In sum, the only three Defendants Plaintiff plausibly alleges to have committed common law torts are MPPS, Assistant Principal Walderzak, and Mr. Russell. But MPPS and Walderzak are entitled to GTLA immunity, and Mr. Russell is entitled to summary judgment on the merits.

**VII.**

Accordingly, it is **ORDERED** that Defendants' Motion for Summary Judgment, ECF

No. 39, is **DENIED IN PART,** to the extent it seeks dismissal of Count II against Defendant

Jason Russell.

Further, it is **ORDERED** that Defendants' Motion for Summary Judgment, ECF No. 39,

is **GRANTED IN PART,** in all other respects.

The effect of this Opinion and Order on Plaintiff's claims is summarized below:

| Count | Claim | Result |
|-------|-------|--------|
| I. | Fourteenth Amendment Racial Discrimination; | Dismissed |
| II. | Fourth and Fourteenth Amendment "Due Process" | Two Surviving Fourth Amendment Claims, both against Mr. Russell in his personal capacity only: <br> • November 11, 2021 unlawful search <br> • November 19, 2021 unlawful seizure <br> Dismissed as to all other Defendants on all other grounds |
| III | *Monell* Municipality Liability; | Dismissed |
| IV. | ELCRA Discrimination | Dismissed |
| V. | Ethnic Intimidation; | Dismissed |
| VI. | Intentional Infliction of Emotional Distress | Dismissed |
| VII. | Assault and Battery | Dismissed |
| VIII. | IDEA Failure to Educate; | Dismissed |
| IX. | Rehabilitation Act Discrimination | Dismissed |
| X. | MSEA Failure to Educate | Dismissed |
| XI. | IDEA Failure to Educate; | Dismissed |
| XII. | Public Act 394 Seclusion and Restraint | Dismissed |

Further, it is **ORDERED** that the Scheduling Order, ECF No. 9, as amended by ECF Nos.

18; 51, is **ADJOUNRED** as follows:

| | |
|---|---|
| Motions *in Limine* Due: | September 16, 2024 |
| Rule 26 Disclosures Due: | September 30, 2024 |
| Pretrial Submissions Due: | October 15, 2024 |
| Final Pretrial Conference: | October 22, 2024 at 2:00 PM EST |
| Jury Trial: | November 12, 2024 at 8:30 AM EDT |

Dated: August 14, 2024

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge